**IN THE UNITED STATES DISTRICT COURT EASTERN DISTRICT OF ARKANSAS CENTRAL DIVISION**

**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

MAY 26 2026

TAMMY H. DOWNS, CLERK

By:_____
DEP CLERK

FELICIA BRANCH,                                          **PLAINTIFF**

v.                                    CASE NO.: 4:26-cv-535-JM

UNIVERSITY OF ARKANSAS AT LITTLE ROCK,

COLIN CRAWFORD,
in his individual and official capacities;                **DEFENDANTS.**

CHRISTINA S. DRALE,
in her individual and official capacities; and

TIM GRIFFIN,
in his individual capacity,

---

## COMPLAINT

## JURY TRIAL DEMANDED

---

## INTRODUCTION

1.      This is a civil-rights action under 42 U.S.C. § 1983 arising from the suspension and termination of Plaintiff Felicia Branch from her position as Assistant Professor of Clinical Education and Director of the Low-Income Taxpayer Clinic at the William H. Bowen School of Law at the University of Arkansas at Little Rock.

2.      Branch was suspended and then terminated because of off-duty political speech she made as a private citizen on her personal Facebook account concerning a matter of public concern. The First Amendment does not permit public university officials to punish a faculty member for such speech merely because it provoked public outrage, political condemnation, or reputational discomfort. A nontenured public-college teacher may pursue a constitutional claim where nonretention or termination is based on protected public criticism and speech on matters of public concern. See *Perry v. Sindermann*, 408 U.S. 593, 597–98 (1972).

3.      Defendants Colin Crawford and Christina S. Drale were the university officials who carried out and finalized the adverse action against Branch. Crawford suspended Branch,

This case assigned to District Judge Moody
and to Magistrate Judge Kearney

investigated her speech, and issued the dismissal-for-cause letter. Drale later upheld that dismissal and imposed the final decision, even after the Faculty Appeals panel disagreed with termination and concluded that a warning would have been more appropriate.

4.      Defendant Tim Griffin, acting from the authority and public stature of his office as Arkansas Attorney General, publicly called for Branch's termination and amplified the pressure surrounding her speech. Griffin was not the employer or final decisionmaker, but his official conduct materially intensified the retaliatory environment in which the university acted.

5.      The asserted justification for Branch's dismissal was disruption, professionalism, and institutional harm. But the facts show a materially different picture: outside political and reputational pressure escalated quickly; internal leadership adopted a condemnatory posture early; some actual disruption existed, but much of it was amplified by third parties and deepened by the university's own suspension-and-replacement response; and the university chose the harshest sanction despite mixed internal reaction and despite the Faculty Appeals panel's decision against termination.

6.      Branch seeks declaratory and prospective injunctive relief against Crawford and Drale in their official capacities, including reinstatement or equivalent relief. She also seeks damages against Crawford, Drale, and Griffin in their individual capacities for violating her clearly established constitutional rights.

## PARTIES

7.      Plaintiff Felicia Branch has been a resident of Pulaski County, Little Rock, Arkansas for over six months.

8.      From July 1, 2025, until her termination in September 2025, Branch served as Assistant Professor of Clinical Education and Director of the Low-Income Taxpayer Clinic at the William H. Bowen School of Law at the University of Arkansas at Little Rock.

9.      Defendant Colin Crawford was, at all relevant times, Dean and Professor of Law at the William H. Bowen School of Law. He is a resident of Arkansas for longer than six months, and his place of business is located at 1201 McMath Avenue, Little Rock, AR 72202 in Pulaski County. He is sued in his individual capacity for damages and in his official capacity for declaratory and prospective injunctive relief.

10.    Defendant Christina S. Drale was, at all relevant times, Chancellor of the University of Arkansas at Little Rock. She is a resident of Arkansas for longer than six months, and her place of business is located at Charles Donaldson Student Services Center Ste. 423, 2801 S. University Ave., Little Rock, AR 72204. She is sued in her individual capacity for damages and in her official capacity for declaratory and prospective injunctive relief.

11.    Defendant Tim Griffin was, at all relevant times, Attorney General of the State of Arkansas. He is a resident of Arkansas, and his place of business is located at 323 Center Street, Ste 200 Little Rock, AR 72201. He is sued in his individual capacity only.

12.    Defendant University of Arkansas at Little Rock is a public university located at 2801 S. University Ave., Little Rock, Arkansas 72204. The William H. Bowen School of Law is a school within UA Little Rock and is not a separate entity from UA Little Rock. At all relevant times, Defendants Colin Crawford and Christina S. Drale were employees of UA Little Rock serving in different duty posts, with Crawford serving as Dean and Professor of Law at the William H. Bowen School of Law and Drale serving as Chancellor of UA Little Rock.

### JURISDICTION AND VENUE

13.    This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States, including 42 U.S.C. § 1983.

14.    This Court also has jurisdiction under 28 U.S.C. § 1343 because this action seeks redress for the deprivation, under color of state law, of rights secured by the Constitution of the United States.

15.    Plaintiff seeks prospective declaratory and injunctive relief against Defendant UA Little Rock and against Defendants Crawford and Drale in their official capacities for ongoing consequences of unconstitutional conduct, including reinstatement or equivalent prospective relief. Plaintiff seeks monetary damages only against defendants sued in their individual capacities. See *Monroe v. Arkansas State Univ.*, 495 F.3d 591, 594 (8th Cir. 2007); *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 & n.10 (1989); *Johnson v. Outboard Marine Corp.*, 172 F.3d 531, 535 (8th Cir. 1999).

16.    Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to these claims occurred in this District, and because

the defendants relevant to the university employment decision reside or performed the relevant acts in this District.

## FACTUAL ALLEGATIONS

***Branch's appointment and role.***

17.     On July 1, 2025, Plaintiff Felicia Branch began serving as Assistant Professor of Clinical Education and Director of the Low-Income Taxpayer Clinic at the William H. Bowen School of Law at the University of Arkansas at Little Rock. In that role, she was responsible for directing the clinic and overseeing its taxpayer representation work.

18.     Before accepting the Bowen position, Branch had prior teaching and tax-practice experience, including prior law-school teaching and tax-law practice.

19.     On December 16, 2024, Dean Colin Crawford offered Branch the position of Assistant Professor of Clinical Education and Director of the Low-Income Taxpayer Clinic. The offer contemplated a 12-month appointment with salary, benefits, and relocation support.

20.     Branch was hired into a full-time, 12-month faculty position. Her employment materials reflected that the clinic-director role included client representation, law-student supervision, classroom instruction, community outreach and education, and compliance responsibilities connected to the Low-Income Taxpayer Clinic grant program.

21.     Branch accepted the position in reliance on Defendants' offer and relocated for the job. Her personnel file reflects a December 16, 2024, offer letter for the Bowen Law position, a July 1, 2025, hire date and first day of work, and a later one-time relocation payment in the amount of $8,212.62 tied to her move for the position.

22.     As Director of the Low-Income Taxpayer Clinic, Branch's position also required grant-related reporting to the federal government. The organization financial records used for those grant-related obligations were UA Little Rock's records, not separate financial records of the William H. Bowen School of Law as an independent budget entity.

23.     The position was housed within the Bowen School of Law under Dean Colin Crawford's supervisory organization. Branch's personnel file identifies her position as Assistant Professor of Clinical Education, full time, 12-month academic work period, within the Bowen School of Law.

24.    The position Branch accepted was a clinical faculty position centered on legal education and taxpayer representation. It was not a public-relations post, a communications role, or an office charged with speaking on behalf of the University.

***Branch's off-duty speech on her personal Facebook page.***

25.    In September 2025, after the death of Charlie Kirk, Branch made posts from her personal Facebook page expressing her views about him and related public issues.

26.    Branch's Facebook page did not identify UA Little Rock as her employer, and she was not speaking on behalf of the University when she made the posts. In her written statement, Branch explained that she maintained a personal Facebook page separate from her university role and did not list UALR as her employer on that page.

27.    Branch made the posts as a private citizen, outside the performance of her faculty and clinic duties. During the University's investigation, Branch stated that the posts were not made during work hours and were not made from a university computer, and the HR summary recorded those same facts.

28.    Branch's posts were not classroom instruction, clinic advice, client communication, or official University communication. They were personal political commentary posted on her own account.

29.    Branch later explained in writing that she regarded the posts as personal expression concerning a public figure and broader political and social issues. She further stated that her original posts had limited direct reach before outside amplification dramatically expanded public attention to them. The analytics she submitted as part of her written statement reflected comparatively modest initial engagement on her own page.

30.    Branch's speech did not arise from an internal workplace grievance. It concerned a public figure, a nationally discussed event, and Branch's own political and moral views about those matters.

31.    At all relevant times, Branch's speech was separate from the institutional functions for which she had been hired: directing the Low-Income Taxpayer Clinic, supervising students, teaching clinic-related coursework, and carrying out grant- and client-related responsibilities.

***External pressure and the University's immediate response.***

32.     By September 16, 2025, Branch's off-duty Facebook posts had become the subject of escalating outside pressure directed at directed at UA Little Rock, including Bowen Law School. The matter did not unfold as an ordinary internal employment issue. Instead, it quickly became a politically amplified controversy driven by public officials, outside complainants, and reputational concerns.

33.     On September 16, 2025, a communications operative tied to Political Strategies / Conduit contacted Dean Colin Crawford asking whether the law school was aware of Branch's comments and what action would be taken. This contact reflected early external pressure directed at the school to respond publicly and institutionally to Branch's speech.

34.     Also on September 16, 2025, the University of Arkansas System President's office circulated a message concerning Branch's posts to trustees and indicated that it could be shared with others asking about the matter. The issue was therefore elevated quickly beyond a routine personnel matter and into a system-level communications problem.

35.     External pressure also came from political officials and outside complainants invoking campus safety, professionalism, institutional reputation, parent confidence, employer concerns, and public image. According to the University's own later dismissal rationale, complaints came from students, parents, alumni, constitutional officers, other appointed officials, legislators, and citizens.

36.     On September 16, 2025, Attorney General Tim Griffin publicly called for Branch's termination. His official public statements and related press materials became part of the documentary environment surrounding the University's treatment of Branch's speech. Lt. Gov. Leslie Rutledge likewise called for investigation and discipline.

37.     Attorney General Griffin also issued an official press release entitled, "Attorney General Griffin Calls for Termination of UALR Law School Professor."[1]

38.     The press release specifically stated: "The First Amendment protects your right to say what you want. It does not, however, guarantee you the job you want, regardless of what you say. The law school should terminate her immediately."

---

[1] https://arkansasag.gov/news-release/attorney-general-griffin-calls-for-termination-of-ualr-law-school-professor/, last seen on March 19, 2026.

39.    Governor Sarah Huckabee Sanders also publicly posted that Branch should be "fired immediately."



40.    The controversy quickly moved beyond direct complaints and became a broader political and media event. By September 17, 2025, the University was tracking the matter through large-scale media-monitoring reports and related public-reaction materials, reflecting that the institution was treating the issue as a significant reputational and communications crisis.

41.    Also on September 16, 2025, the University suspended Branch with pay while it investigated her posts. Complaints were being routed through HR and other University channels that same day, including complaints asserting that Branch's posts made her unfit for public education or made the institution appear unsafe or professionally compromised.

42.    The University's response was immediate and operational, not merely administrative. On September 16, 2025, clinic administration sought an immediate status report concerning tax clinic matters and pending deadlines, showing that the suspension of Branch triggered an institutional response affecting the clinic's ongoing work.

43.    At the same time, the University began handling the matter as both a disciplinary issue and a reputational-management issue. The FOIA record reflects that outside pressure, internal message circulation, and public reaction were all entering the University's decision environment almost immediately after Branch's posts drew broader attention.

44.    As the external pressure intensified, the controversy surrounding Branch's speech was no longer confined to the actual content and reach of her original Facebook posts. It had become an externally amplified event shaped by public officials, media dissemination, and complaints directed at UA Little Rock and its law school.

***Internal hardening, mixed reaction, and process red flags.***

45.    As outside pressure mounted, University leadership did not simply receive complaints and maintain a neutral investigative posture. Instead, the administration adopted a condemnatory tone early in the process, before the matter had been meaningfully closed.

46.    By September 17, 2025, an internal Dean Statement Draft already described Branch's posts as "reprehensible" and as celebrating a political assassination, even though the investigation was still supposedly ongoing. That early internal characterization reflected a hardened administrative posture before the University's process had run its course.

47.    On September 17, 2025, Branch met with Human Resources and explained the context of her posts. The HR summary recorded that Branch confirmed the posts were hers, stated they were not made during work hours or from a university computer, explained that she later made them private after safety concerns arose, and reported that none of her students had complained to her directly.

48.    Even while criticism was mounting, the response to Branch was not one-sided. The record included support for Branch, support for free expression, and internal disagreement with termination. At least one support message objected to punishing Branch for speech on a personal platform, and later materials reflected additional support from students, alumni, and others who viewed termination as an unconstitutional overreaction.

49.    Branch also later stated that she received support from non-friends, a Bowen student, a clinic client, professors, and other students, and that some supporters feared retaliation if they spoke publicly. Those facts are inconsistent with any suggestion that the internal and surrounding reaction to her speech was uniform or overwhelmingly in favor of termination.

50.    At the same time, the University was already taking steps that suggested the outcome of the process was narrowing before Branch was fully heard. The most significant red flags appear in the September 22–24, 2025 time frame.

51.    On September 22, 2025, the school was already moving to hire Alicia Mitchell temporarily to teach and direct the Tax Clinic during Branch's suspension, and requests were made the same day to begin access and key arrangements for Mitchell. Those replacement steps were underway before the University formally completed its process as to Branch.

52.    Also on September 22, 2025, after replacement planning was already underway, Crawford emailed Branch stating that the investigation had concluded, identifying the

theories under review, and saying that he "reserve[d] judgment" pending a meeting with her on September 24. This juxtaposition—replacement activity on one hand and a stated reservation of judgment on the other—supports the inference that the process was already materially hardened before it was formally closed.

53.    In that September 22 communication, Crawford told Branch that the investigation had concluded, cited complaints from constitutional officers, other appointed officials, legislators, alumni, and students, invoked professionalism standards and Board Policy 405.4, and stated that her posts "may constitute cause for dismissal." He nevertheless represented that he would reserve judgment until after meeting with her.

54.    The same process window also included legal coordination around a draft dismissal notice on September 24, 2025. The existence of draft-dismissal activity in that same period further supports the inference that the disciplinary outcome was crystallizing before the process was meaningfully complete.

55.    In her written statement dated September 24, 2025, Branch directly challenged the fairness and openness of the process. She argued that she was speaking as a private citizen on a personal Facebook page and that the matter was not a real investigation because the University's communications made it appear that the decision had already effectively been made. She also asserted that the amplification by constitutional officers—not the original reach of her posts—caused the disruption later invoked against her.

56.    Branch further stated that the clinic disruption cited by the University was itself tied to her suspension and the institution's own response. She asserted that the clinic had been disrupted because she had been removed from it and because the clinic could not function normally without a qualified director in place.

57.    The process concerns did not end with Crawford's decision. After Branch pursued review, the Faculty Appeals panel later voted to disagree with termination, and the University's own final decision materials acknowledged that the panel majority believed a warning would have been more appropriate than dismissal.

58.    Nevertheless, Chancellor Drale overrode that lesser recommendation and made the dismissal final. That sequence—early condemnatory posture, replacement planning before process closure, draft-dismissal activity, Branch's objections that the process was already decided, and ultimate override of the panel's non-termination recommendation—supports

the inference that the University's response was not a neutral, open-ended review of protected speech, but a hardened disciplinary process moving toward the harshest sanction.

***Termination, appeal, panel disagreement, and final override.***

59.     On September 24, 2025, after meeting with Branch, Dean Colin Crawford issued a formal dismissal-for-cause letter terminating her employment effective immediately.

60.     In that letter, Crawford tied the adverse action directly to Branch's Facebook posts and the reaction they had generated. He relied on the volume and sources of complaints received by UA Little Rock and Bowen Law School, including complaints from students, parents, alumni, statewide officials, legislators, and citizens, and he asserted that Branch's posts had disrupted the operation and effectiveness of the law school and the Low-Income Taxpayer Clinic.

61.     Crawford also invoked professionalism-based standards and faculty-conduct concepts as part of the stated rationale for dismissal. In substance, he asserted that Branch's off-duty speech and her subsequent responses to critics were incompatible with the standards expected of a Bowen faculty member and clinic director.

62.     On September 30, 2025, Branch invoked the review procedure available under university policy and formally requested review of her dismissal.

63.     The matter then proceeded through the University's internal review process. On October 9, 2025, the Faculty Appeals panel voted to disagree with termination. According to the later final decision, the panel majority viewed Branch's social-media posts as a mistake but concluded that a warning would have been more appropriate than dismissal.

64.     The Faculty Appeals panel's disagreement was significant. It showed that, even within the University's own review structure, termination was not understood to be the only reasonable response to Branch's off-duty speech.

65.     On October 13, 2025, Chancellor Christina S. Drale overrode the panel's non-termination position and upheld the dismissal. Her decision made Branch's termination final.

66.     In her final decision, Drale rejected the argument that limited direct traffic on Branch's personal page, supportive feedback, or the role of high-profile third-party actors negated the disruption rationale invoked by the University. Instead, she concluded that the posts had

produced disruption through multiple channels and audiences and that a warning or reprimand would not suffice.

67.    Drale's final decision thus adopted the harshest available result despite the panel's contrary recommendation and despite the mixed reaction reflected elsewhere in the record. Her override was the final institutional act that converted Crawford's dismissal decision into the University's completed termination of Branch's employment.

68.    Following the termination, the University treated Branch's separation as effective September 24, 2025, and later sent her separation and benefits information reflecting that effective date.

### *Synthesis of the factual allegations.*

69.    Taken together, the facts alleged above show that Branch's termination did not arise from a routine, neutral personnel process addressing an ordinary internal employment problem. Branch engaged in off-duty speech as a private citizen on her personal Facebook page about a matter of public concern, and the controversy that followed was rapidly escalated by outside political pressure, public amplification, and reputational concerns directed at the University and Bowen Law School.

70.    The University did identify some actual operational concerns after Branch was suspended, particularly with respect to the Low-Income Taxpayer Clinic. But the facts also support the inference that a substantial portion of the disruption later invoked against Branch was amplified by third parties and deepened by the University's own response, including suspension, replacement planning, communications control, and the rapid treatment of the matter as a reputational crisis.

71.    The record further reflects that the reaction to Branch's speech was not uniform. Alongside criticism, there was meaningful support for Branch, support for free expression, and internal disagreement with termination. The Faculty Appeals panel's later conclusion that a warning would have been more appropriate than dismissal is especially significant because it shows that even within the University's own review structure, the harshest sanction was not viewed as inevitable or necessary.

72.    The chronology also supports the inference that the University's disciplinary posture hardened early and that the process narrowed toward termination before it was formally complete. The early condemnatory internal draft, the replacement planning that preceded

the September 24 meeting, the draft-dismissal activity, and the final override of the panel's lesser recommendation all support the inference that Branch was not subjected to a genuinely open-ended review of protected speech, but to a process increasingly oriented toward justifying the harshest result.

73.     Before the adverse action, Branch performed her duties, had not received complaints regarding her performance, maintained a strong professional reputation, and demonstrated the tax-law and clinic-management qualifications required for her position. But for Defendants' retaliation against her protected speech, she would not have been terminated.

74.     In short, Branch was suspended and terminated for protected off-duty speech in an environment shaped by politically amplified backlash, institutional overreaction, and a progressively hardened disciplinary response. Crawford and Drale carried out and finalized that response, and Griffin's official public intervention materially intensified the pressure environment in which the adverse action occurred.

75.     Branch has suffered emotional distress, mental anguish, and damage to her professional reputation.

76.     As a result of her termination, Branch has suffered loss of wages, benefits, and other employment-related compensation.

## COUNT I: First Amendment Retaliation / Viewpoint-Based Termination
### 42 U.S.C. § 1983
### *Against Defendants University of Arkansas at Little Rock, Colin Crawford, and Christina S. Drale*

77.     Plaintiff incorporates by reference paragraphs 1 through 76 as though fully set forth herein.

78.     At all relevant times, Branch engaged in activity protected by the First Amendment. Her Facebook posts were made from her personal account, outside the performance of her faculty and clinic duties, and did not constitute official University speech, classroom instruction, clinic advice, client communication, or any other speech made pursuant to her assigned professional responsibilities.

79.     Public-employee speech retaliation claims are governed by the framework set out in *Pickering v. Board of Education*, 391 U.S. 563 (1968), *Connick v. Myers*, 461 U.S. 138

(1983), *Garcetti v. Ceballos*, 547 U.S. 410 (2006), *Lane v. Franks*, 573 U.S. 228 (2014), and *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274 (1977). Under that framework, Branch's speech is protected because she spoke as a private citizen, not pursuant to her official duties, on matters of public concern, and Defendants subjected her to adverse action because of that speech.

80.     The Eighth Circuit likewise recognizes that a protected-speech retaliation claim requires allegations that the plaintiff engaged in protected First Amendment activity, suffered adverse employment action, and that the protected speech was a substantial or motivating factor in that action. See *Ackerman v. Iowa*, 19 F.4th 1045, 1054 (8th Cir. 2021).

81.     Branch's speech addressed matters of public concern. Her posts concerned Charlie Kirk, a public figure, and broader public, political, and social issues arising from his death and public legacy. Even if defendants considered the speech offensive, harsh, or controversial, its character as public-concern speech did not disappear for that reason.

82.     The controversial, offensive, or unpopular character of speech does not remove it from First Amendment protection or from public-concern status. See *Rankin v. McPherson*, 483 U.S. 378, 387 (1987). Accordingly, even if Defendants regarded Branch's speech as harsh, offensive, or deeply misguided, that reaction did not eliminate its constitutional protection.

83.     Defendants UA Little Rock, Crawford, and Drale acted under color of state law at all relevant times.

84.     Defendants UA Little Rock, Crawford, and Drale subjected Branch to adverse employment action. Crawford suspended Branch, investigated her speech, and issued the dismissal-for-cause letter terminating her employment. Drale later upheld that dismissal and made it final notwithstanding the Faculty Appeals panel's disagreement with termination.

85.     Branch's protected speech was a substantial or motivating factor in the adverse action taken against her. The disciplinary process, suspension, dismissal letter, and final affirmance were all expressly tied to the content, viewpoint, and consequences attributed to her Facebook posts. Once Branch shows that her protected speech was a substantial or motivating factor in the adverse action, the burden shifts to Defendants to show they would have taken the same action absent that speech. See *Mt. Healthy*, 429 U.S. at 287.

86.    Defendants disciplined Branch because of the content and viewpoint of her protected speech. The First Amendment forbids public officials from imposing adverse action because they disagree with the viewpoint expressed by the speaker.

87.    Crawford personally knew the content of Branch's speech, investigated it, cited it as the basis for possible dismissal, invoked professionalism and disruption as reasons to sanction it, and made the decision to terminate her employment because of it.

88.    Drale likewise personally knew the content of Branch's speech, the surrounding controversy, the arguments Branch raised in her defense, and the Faculty Appeals panel's recommendation short of termination. Despite that knowledge, Drale chose to adopt and finalize the harshest available sanction.

89.    Defendants' stated rationale for dismissing Branch rested on disruption, professionalism, and institutional harm. But the facts alleged above support the inference that this rationale was legally and factually inadequate. The controversy surrounding Branch's speech was rapidly escalated by outsider complaints, political pressure, media amplification, and reputational concerns, and a substantial portion of the disruption later invoked against Branch was amplified by third parties and deepened by the University's own response. In the Eighth Circuit, vague or outsider-driven disruption theories are insufficient, and thin proof of public backlash does not, standing alone, establish constitutionally sufficient disruption. See *Melton v. City of Forrest City*, No. 23-3398 (8th Cir. Aug. 13, 2025).

90.    Complaints, public condemnation, reputational discomfort, and politically amplified backlash do not by themselves establish constitutionally sufficient disruption to justify termination of protected off-duty speech by a public university faculty member. Nor does vague invocation of professionalism automatically outweigh First Amendment protection, particularly where professionalism is functioning as a proxy for suppressing disfavored viewpoint expression.

91.    The facts alleged above further support the inference that defendants' actions were retaliatory and pretextual. University leadership adopted a condemnatory posture early; replacement planning began before the process was meaningfully closed; draft-dismissal activity occurred in the same window in which Crawford claimed to reserve judgment; and Drale overrode the Faculty Appeals panel's conclusion that a warning, not termination, was the appropriate response.

92.    By suspending and terminating Branch because of her protected off-duty speech and the viewpoint she expressed, Defendants UA Little Rock, Crawford, and Drale violated Branch's rights under the First Amendment to the United States Constitution.

93.    By suspending and terminating Branch because of her protected off-duty speech and the viewpoint she expressed, Defendants Crawford and Drale violated Branch's rights under the First Amendment to the United States Constitution.

94.    It was clearly established long before 2025 that government officials may not retaliate against a public employee for protected speech on matters of public concern. See *Pendleton v. St. Louis County*, 178 F.3d 1007, 1011 (8th Cir. 1999); *Waddell v. Forney*, 108 F.3d 889, 894 (8th Cir. 1997). Defendants Crawford and Drale were therefore on notice that they could not suspend and terminate Branch for protected off-duty speech merely because that speech generated controversy, criticism, or reputational discomfort.

95.    As a direct and proximate result of Defendants Crawford's and Drale's unconstitutional conduct, Branch has suffered and continues to suffer loss of employment, loss of income and benefits, emotional distress, other compensable damages, and ongoing constitutional injury.

96.    Defendants Crawford and Drale are sued in their individual capacities for damages and in their official capacities for declaratory and prospective injunctive relief, including reinstatement or equivalent prospective relief. Defendant UA Little Rock is sued as Branch's employer for declaratory and prospective equitable relief to the extent permitted by law.

97.    Branch is entitled to declaratory relief, prospective injunctive relief, damages, nominal damages, punitive damages where legally available, costs, and reasonable attorney's fees under 42 U.S.C. §§ 1983 and 1988.

### COUNT II: First Amendment Viewpoint Discrimination / Retaliatory Pressure by Coercive Official Amplification
### 42 U.S.C. § 1983
### *Against Defendant Tim Griffin, in his Individual Capacity*

98.    Plaintiff incorporates by reference paragraphs 1 through 97 as though fully set forth herein.

99.    The First Amendment forbids a government official from accomplishing indirectly what he cannot do directly. Government officials may not use threats, coercive pressure, or

the leverage of official authority to induce others to punish or suppress disfavored speech. See *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67–72 (1963); *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175 (2024).

100.    At all relevant times, Branch was engaged in speech protected by the First Amendment. Her Facebook posts were made as a private citizen on her personal account, outside her official duties, and concerned matters of public concern.

101.    At all relevant times, Defendant Tim Griffin was the Attorney General of the State of Arkansas and acted under color of state law. His public statements concerning Branch carried the authority, prestige, and amplification power of that office.

102.    Griffin publicly targeted Branch's speech because of its content and viewpoint. On September 16, 2025, Griffin publicly called for Branch's termination and amplified attention to her posts through official channels, including an official press release demanding that the law school "terminate her immediately."

103.    Branch does not challenge Griffin's ability, as a private matter, to hold opinions or to express disagreement with her speech. Rather, she challenges Griffin's use of the authority and amplification power of his office to push punitive action against protected speech. That is the conduct at issue in this Count.

104.    Griffin was not Branch's employer and was not the final decisionmaker with respect to her suspension or dismissal. But he did not need to be the direct employer to contribute materially to the constitutional injury alleged here. Count II is based on Griffin's role as an outside state actor who used official authority to intensify and channel retaliatory pressure toward the University officials who did terminate Branch.

105.    Whether official conduct crosses the line from persuasion to coercion depends on context, including the official's authority, the content and manner of the communication, and the reaction of the recipient. *Vullo*, 144 S. Ct. at 1333–34.

106.    Griffin's conduct was not limited to generalized public disagreement. Viewed in context, his intervention was formalized through official channels, carried the prestige and coercive significance of statewide office, and became part of the University's decision environment at the very outset of the controversy.

107.    The University's own disciplinary record reflects that complaints and pressure from constitutional officers and other high-level public actors were treated as institutionally

relevant. Crawford's dismissal rationale expressly relied on complaints from statewide officials, among others, and Drale's final decision expressly addressed Branch's argument that high-profile outside actors had amplified the controversy and disruption narrative.

108.    Griffin's official conduct materially intensified the retaliatory environment surrounding Branch's speech. Branch alleged and the record reflected that her original posts had limited direct reach on her own page before amplification by powerful outside actors dramatically expanded the controversy. The resulting public firestorm then became part of the pressure context in which the University suspended, processed, and terminated her.

109.    Griffin's conduct therefore materially contributed to the chain of events leading to Branch's termination. Plaintiff does not allege that Griffin alone fired her or that he was the sole cause of the adverse action. Plaintiff alleges that Griffin's official pressure and amplification helped set in motion, intensify, and shape the retaliatory environment in which the University decisionmakers acted.

110.    Griffin's intervention targeted Branch because of the viewpoint she expressed. His official demand for termination was directed not at some neutral rule violation divorced from speech, but at Branch's protected political expression itself and the public controversy that expression generated.

111.    By using the authority and amplification power of his office to press punitive action against protected speech and to materially intensify the retaliatory environment that culminated in Branch's dismissal, Griffin violated Branch's rights under the First Amendment to the United States Constitution.

112.    Griffin's challenged conduct consisted of extra-judicial public and official communications, not prosecutorial advocacy in court, and therefore is not shielded by absolute prosecutorial immunity. See *Buckley v. Fitzsimmons*, 509 U.S. 259, 277–78 (1993).

113.    As a direct and proximate result of Griffin's unconstitutional conduct, Branch has suffered and continues to suffer loss of employment-related interests, emotional distress, other compensable damages, and ongoing constitutional injury.

114.    Griffin is sued in his individual capacity only. Branch seeks damages, nominal damages, punitive damages where legally available, costs, and reasonable attorney's fees under 42 U.S.C. §§ 1983 and 1988.

**PRAYER FOR RELIEF**

Plaintiff seeks prospective declaratory and injunctive relief against Defendant UA Little Rock and against Crawford and Drale in their official capacities, and seeks monetary relief only against defendants sued in their individual capacities.

WHEREFORE, Plaintiff Felicia Branch respectfully requests that the Court enter judgment in her favor and grant the following relief:

A.  Declare that Defendants UA Little Rock, Colin Crawford, and Christina S. Drale violated Plaintiff's rights under the First Amendment by suspending and terminating her for protected off-duty speech;

B.  Declare that Defendant Tim Griffin violated Plaintiff's rights under the First Amendment by using the authority and amplification power of his office to materially intensify the retaliatory environment that culminated in Plaintiff's termination;

C.  Enter prospective injunctive relief against Defendant UA Little Rock and against Defendants Crawford and Drale in their official capacities, prohibiting continued enforcement of the unconstitutional actions challenged herein and requiring relief sufficient to remedy the ongoing consequences of those actions;

D.  Order Plaintiff's reinstatement to her prior position as Assistant Professor of Clinical Education and Director of the Low-Income Taxpayer Clinic, or to an equivalent position with substantially similar responsibilities, status, seniority, and benefits;

E.  Restore Plaintiff's seniority, employment status, and employment-related benefits to the extent permitted by law;

F.  Award front pay in lieu of reinstatement only if the Court determines that reinstatement is not feasible;

G.  Award back pay, lost employment benefits, and other economic damages to the extent permitted by law;

H.  Award compensatory damages against Defendants Crawford, Drale, and Griffin, in their individual capacities, in an amount to be determined at trial;

I.  Award nominal damages against Defendants Crawford, Drale, and Griffin, in their individual capacities;

J.  Award punitive damages against Defendants Crawford, Drale, and Griffin, in their individual capacities, to the extent permitted by law;

K.  Award Plaintiff her reasonable attorney's fees, costs, and expenses pursuant to 42 U.S.C. § 1988 and other applicable law;

L.  Award pre-judgment and post-judgment interest as allowed by law; and

M.  Grant such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: May 26, 2026.

Respectfully Submitted,

/s/ Verona E. Swanigan

Verona E. Swanigan, #2017012
Pasquel Lee, Esq
The Swanigan Firm
425 W. Capitol Ave #1533
Little Rock, Arkansas 72201
(866) 603-5239 - Phone
(501) 604-5700 - Fax
callthelawlady@outlook.com