IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS


FELICIA BRANCH                                                          PLAINTIFF


v.                          CASE NO. 4:26-CV-00535-JM

UNIVERSITY OF ARKANSAS AT LITTLE ROCK,
COLIN CRAWFORD,
in his individual and official capacities;
CHRISTINA S. DRALE,
in her individual and official capacities; and
TIM GRIFFIN,
in his individual capacity                                             DEFENDANTS


### OFFICIAL-DEFENDANTS' BRIEF IN SUPPORT OF OFFICIAL-DEFENDANTS' MOTION TO DISMISS

Plaintiff Felicia Branch brings this action under 42 U.S.C. § 1983 alleging that the University of Arkansas at Little Rock,[1] Dean Collin Crawford, and Chancellor Christina Drale violated the First Amendment by terminating her employment after a series of controversial posts on her personal Facebook account generated widespread public criticism and disruption within William H. Bowen School of Law. She further alleges that Attorney General Tim Griffin violated the First Amendment by publicly calling for her termination through an official press release. But the First Amendment does not prohibit public employers from taking certain actions to avoid and mitigate workplace disruption, nor does it transform public criticism by an elected official into unconstitutional coercion.  Accordingly, Branch fails to state a claim as a matter of law as to Defendants Crawford, Drale, and Griffin (collectively, "Official-Defendants"). Nor, as a threshold

---

[1] The University of Arkansas at Little Rock has separately moved to dismiss the claims against it because it does not exist independently of University of Arkansas, meaning that it lacks capacity to be sued, and based on sovereign-immunity grounds.

matter, does the Court even have jurisdiction over most of Branch's claims, as they are either moot or barred by sovereign immunity.

On the merits, as to Defendants Crawford and Drale, Branch does not plausibly allege a constitutional violation under the well-established framework governing public-employee speech. Branch's own allegations establish that the University's[2] interests in maintaining the effective operation of its law school and clinical program outweighed her asserted speech interests under *Pickering v. Board of Education*, 391 U.S. 563 (1968). Moreover, because Branch does not plausibly allege a constitutional violation or that clearly established law was violated, Crawford and Drale are entitled to qualified immunity.

The claims against Defendant Griffin also fail. Branch does not plausibly allege that Griffin exercised coercive governmental authority required by *National Rifle Association of America v. Vullo*, 602 U.S. 175 (2024), or that his public statements caused the University's employment decision. Instead, the Complaint alleges only that Griffin publicly expressed his views as one participant in a broader controversy that included criticism from numerous other public officials and private citizens before the University conducted its own investigation and reached its own employment decision. In any event, Griffin is likewise entitled to qualified immunity because no clearly established law prohibited the conduct alleged in the Complaint.

Because the Court lacks jurisdiction and Branch failed to plausibly allege a violation of the First Amendment and because Official-Defendants are independently entitled to qualified immunity, the Complaint should be dismissed under Rule 12(b)(1) and 12(b)(6).

---

[2] The term "University" as used in this briefing refers to the University of Arkansas system and the Board of Trustees.

## BACKGROUND

Plaintiff Felicia Branch was hired to work at William H. Bowen Law School, which is a part of the University of Arkansas at Little Rock, as the Assistant Professor of Clinical Education and the Director of the Low-Income Taxpayer Clinic. ECF No. 1 ¶ 17.[3] According to the Complaint, Branch accepted the position after receiving an offer from Dean Collin Crawford in December 2024 and began her employment on July 1, 2025. *Id*. ¶¶ 19–21. Her responsibilities included directing the Low-Income Taxpayer Clinic, supervising law students, providing classroom instruction, conducting community outreach, and overseeing compliance with federal grant requirements. *Id*. ¶¶ 20–24.

In September 2025, after the political assassination of Charlie Kirk, Branch made several posts about his death on her personal Facebook page. *Id*. ¶ 25. Branch's numerous posts included statements that she was "celebrating that an evil man died," that "the world is a little more balanced" since Charlie Kirk's death, that she "hope[s] Charlie Kirk is restless in hell," and that those who were mourning Charlie Kirk's death were Klu Klux Klan members.[4] Some of her posts

---

[3] Given the motion-to-dismiss standard to accept as true all of the factual allegations contained in the Complaint, *see infra* 5–6, the factual allegations in the background are taken from the complaint and materials embraced by the complaint.

[4] *See Lieutenant Governor Leslie Rutledge Calls for Investigation of Law Professor Who Celebrated Political Assassination*, Lieutenant Governor Official Page (Sep. 16, 2025), https://ltgovernor.arkansas.gov/press_releases/lieutenant-governor-leslie-rutledge-calls-for-investigation-of-law-professor-who-celebrated-political-assassination/(last visited July 30, 2026). The Court may take judicial notice of this official government website in evaluating the motion to dismiss. *See Missourians for Fiscal Accountability v. Klahr*, 830 F.3d 789, 793 (8th Cir. 2016). Moreover, although Branch does not attach the social media posts in question to the Complaint, she does specifically reference the posts, describe her view of them, and detail the feedback she received about them. ECF 1, ¶¶ 25–29, 36–39. Therefore, the actual content of her posts are necessarily embraced by her complaint. *See Schriener v. Quicken Loans, Inc.*, 774 F.3d 442, 444 (8th Cir. 2014) ("In addition to the allegations in the complaint, we may consider those materials that are necessarily embraced by the pleadings."); *Doe v. Saint John's Univ., Minnesota*, No. 21-CV-0361 (WMW/TNL), 2021 WL 4993087, at *2 (D. Minn. Oct. 27, 2021) (citing *Zean v. Fairview Health Servs.*, 858 F.3d 520, 526 (8th Cir. 2017) ("Materials are embraced by the pleadings when a complaint alleges the contents of the materials and no party questions their authenticity.").

included pictures as well:[5]



[5] *See Lieutenant Governor Leslie Rutledge Calls for Investigation of Law Professor Who Celebrated Political Assassination*, Lieutenant Governor Official Page (Sep. 16, 2025), https://ltgovernor.arkansas.gov/press_releases/lieutenant-governor-leslie-rutledge-calls-for-investigation-of-law-professor-who-celebrated-political-assassination/(last visited July 30, 2026).



Branch alleges her posts constituted her personal political commentary rather than classroom instruction, client communications, or official University speech. *Id.* ¶¶ 28–31.

According to the Complaint, by September 16, 2025, Branch's Facebook posts had generated significant public attention and prompted widespread complaints directed to the University and Bowen Law School. *Id.* ¶ 32. Branch alleges that communications personnel

contacted Dean Crawford regarding the posts and inquired what action Bowen Law School intended to take. *Id.* ¶ 33. Branch further alleges that the University of Arkansas System President's Office circulated communications concerning the matter to members of the Board of Trustees. *Id.* ¶ 34. Complaints regarding Branch's posts were received from "students, parents, alumni" and "citizens" expressing concerns about Branch's continued employment and the University's reputation. *Id.* ¶ 35. State officials, such as "constitutional officers, other appointed officials, and legislators," voiced concerns too. *Id.* For instance, Governor Sarah Huckabee Sanders, Lieutenant Governor Leslie Rutledge, and Attorney General Tim Griffin, all made statements publicly condemning what they characterized as Branch "celebrating political assassination." *Id.* ¶¶ 39, 36–37. Attorney General Griffin and Governor Sanders both called for Branch's termination. *Id.* ¶¶ 37–39. Lieutenant Governor Rutledge called for "investigation and discipline." *Id.* ¶ 36.

In short, Branch's posts generated a litany of "direct complaints" from many different quarters, and a "broader political and media event"—placing the University in "a significant reputational and communications crisis." *Id.* ¶ 40. The Complaint details how the University was receiving complaints "through HR and other University channels" that asserted "that Branch's posts made her unfit for public education or made the institution appear unsafe or professionally compromised." *Id.* ¶ 41.

On September 16, 2025, the University put Branch on administrative leave with pay pending the investigation into the posts. *Id.* That same day, the University "sought an immediate status report concerning tax clinic matters and pending deadlines." *Id.* ¶ 42. Branch met with Human Resources on September 17, 2025, and confirmed that the Facebook posts were hers. *Id.*

¶ 47. The Complaint alleges that Branch informed Human Resources that the posts were made from her personal account, outside working hours, and not from a University computer. *Id.*

On September 22, 2025, Crawford subsequently informed Branch that the investigation had concluded, advised her that her conduct could constitute cause for dismissal, and afforded her an opportunity to meet with him before a final decision was made. *Id.* ¶¶ 52–53. On September 22, 2025, Branch alleges that the University had already began considering hiring an individual "temporarily to teach and direct the Tax Clinic during Branch's suspension." *Id.* ¶ 51.

Following Branch's meeting with Crawford, Crawford terminated Branch's employment for cause effective September 24, 2025. *Id.* ¶ 59. According to the Complaint, the dismissal letter relied on Branch's Facebook posts, the complaints received by the University by "students, parents, alumni, statewide officials, legislators and citizens," and the disruption to the operations of Bowen Law School and the Low-Income Taxpayer Clinic. *Id.* ¶¶ 60–61. Further, Crawford noted that Branch's posts were "incompatible with the standards expected of a Bowen faculty member and clinic director" as laid out in "professionalism-based standards and faculty-conduct concepts." *Id.* ¶ 61.

Subsequently, Branch exercised her right to appeal under University procedures. *Id.* ¶ 62. According to the Complaint, even a Faculty Appeals Panel "viewed Branch's social-media posts as a mistake," but the panel recommended that Branch receive a warning rather than dismissal. *Id.* ¶¶ 63–64. The Complaint alleges that Chancellor Christina Drale thereafter reviewed the matter and affirmed Crawford's decision, concluding that termination, rather than a lesser sanction, was warranted because "the posts had produced disruption through multiple channels and audiences." *Id.* ¶¶ 65–68.

Branch subsequently filed this action asserting First Amendment claims against Crawford and Drale in both their individual and official capacities and against Griffin in his individual capacity. *Id.* ¶¶ 77–114.

### LEGAL STANDARD

A motion pursuant to Federal Rule of Civil Procedure 12(b)(1) challenges whether the Court has subject matter jurisdiction. The party asserting subject matter jurisdiction bears the burden of proof. *Great Rivers Habitat Alliance v. FEMA*, 615 F.3d 985, 988 (8th Cir. 2010). Sovereign immunity is a jurisdictional, threshold matter that is properly addressed under Rule 12(b)(1). *See Lors v. Dean*, 746 F.3d 857, 861 (8th Cir. 2014); *Brown v. United States*, 151 F.3d 800, 803–04 (8th Cir. 1998).

Further, under Rule 12(b)(6), defendants may move to dismiss for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Although a court accepts well-pleaded factual allegations as true and draws reasonable inferences in the plaintiff's favor, "labels and conclusions" and "a formulaic recitation of the elements" do not suffice. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A complaint must include enough factual matter to state a claim that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Plausibility requires factual content that permits a reasonable inference that the defendant is liable for the alleged misconduct. *Id*. Courts do not accept as true legal conclusions couched as factual allegations. *Id*. at 678–79.

**ARGUMENT**

**I.   BRANCH'S CLAIMS ARE JURISDICTIONALLY DEFICIENT AND SHOULD BE DISMISSED.**

Most of Branch's claims fail on threshold, jurisdictional grounds. Her claim for reinstatement is moot, so the Court lacks Article III jurisdiction over it. And her claims for declaratory relief and for damages against Crawford and Drale are barred by sovereign immunity.

**A.  Branch's request for reinstatement is moot.**

This Court lacks Article III jurisdiction over Branch's claim for injunctive relief, which requests her reinstatement. *See, e.g.*, *Murthy v. Missouri*, 603 U.S. 43, 44 (2024) ("standing is not dispensed in gross . . . , plaintiffs must demonstrate standing for each claim that they press against each defendant, and for each form of relief that they seek" (quotation omitted)); *Bedford v. Missouri Dep't of Soc. Servs., Fam. Support Div.*, 179 F.4th 611, 616 (8th Cir. 2026) ("[m]ootness is the doctrine of standing set in a time frame" (cleaned up)). According to the Complaint, Branch's appointment was only for a 12-month term, beginning July 1, 2025. ECF 1, ¶¶ 19, 21. So even if Branch had not been fired, that term would have ended by now.  And "request[s] for reinstatement [are] moot" when the plaintiff's "term in office has expired." *Scott-Anderman v. Martinez*, 60 F.4th 680, 683 (D.C. Cir. 2023); *see Dibble v. Quinn*, 793 F.3d 803, 807 (7th Cir. 2015) (explaining public employee's reinstatement claims were moot because their terms had since expired). Branch's request for reinstatement is therefore moot—and this Court lacks jurisdiction over it.  *See, e.g.*, *McKinley v. Kaplan*, 177 F.3d 1253, 1258 (11th Cir. 1999) (explaining that plaintiff's First Amendment retaliation "claim for reinstatement became moot" at point when her term of

9

appointment would have ended anyway); *UWM Student Ass'n v. Lovell*, 888 F.3d 854, 862 (7th Cir. 2018); *Thornton v. Barnes*, 890 F.2d 1380, 1385 (7th Cir. 1989).

**B. Branch's request for retrospective declaratory relief is barred by sovereign immunity.**

Sovereign immunity bars Branch's request for declaratory relief against Official-Defendants because it seeks only a declaration regarding the legality of completed past conduct. Although *Ex parte Young* permits federal courts to award *prospective* declaratory and injunctive relief to remedy *ongoing* violations of federal law, it does not authorize declarations that state officials violated federal law in the *past. See Just. Network Inc. v. Craighead County*, 931 F.3d 753, 764 (8th Cir. 2019) ("[D]eclaratory relief is limited to prospective declaratory relief."); *Heartland Acad. Cmty. Church v. Waddle*, 427 F.3d 525, 530–31 (8th Cir. 2005). As the Supreme Court explained in *Green v. Mansour*, where "there is no claimed continuing violation of federal law," a declaratory judgment concerning "the legality of past conduct" falls outside the *Ex parte Young* exception and is barred by sovereign immunity and the Eleventh Amendment. 474 U.S. 64, 73 (1985). Consistent with those principles, the Eighth Circuit has recently reiterated that declaratory relief is intended "to define the legal rights and obligations of the parties in anticipation of *some future conduct*, not simply to proclaim liability for a past act." *Smith v. Reynolds*, 139 F.4th 631, 637–38 (8th Cir. 2025) (quoting *Just. Network*, 931 F.3d at 764) (emphasis in original).

But a declaration regarding a past act is precisely the relief Branch requests. She asks this Court to declare that Official-Defendants "violated Plaintiff's rights under the First Amendment" by suspending and terminating her employment. ECF No. 1 at 18. That request concerns only the legality of completed past actions and seeks no declaration governing the parties' future legal relationship. Because Branch seeks a retrospective declaration of liability rather than prospective

10

relief to remedy an ongoing violation of federal law, her request falls outside the *Ex parte Young* exception and is barred by sovereign immunity.

**C. Branch's claims for monetary relief against Crawford and Drale are barred by sovereign immunity because Branch in fact seeks damages from the State.**

Sovereign immunity also bars Branch's requests for monetary relief against Crawford and Drale because, styled either as official or individual-capacity claims, those claims seek recovery from the state treasury.

Branch requests back pay (and front pay in lieu of reinstatement) without distinction as to whether she is seeking damages against Crawford and Drale in their individual or official capacities. ECF 1, at 18. Insofar as Branch is alleging that she is entitled to damages from Crawford and Drale in their official capacity, Branch's claim is barred by sovereign immunity. *See Treleven v. Univ. of Minn.*, 73 F.3d 816, 818 (8th Cir. 1996) ("[T]he Eleventh Amendment prohibits federal-court lawsuits seeking monetary damages from individual state officers in their official capacities because such lawsuits are essentially for the recovery of money from the state." (internal quotation marks omitted)).

Insofar as Branch is seeking damages against Crawford and Drale in their individual capacities, those claims are similarly barred in these circumstances. When determining whether sovereign immunity applies, courts look to the nature of the relief sought to determine whether "the state is the real, substantial party in interest." *Edelman v. Jordan*, 415 U.S. 651, 663 (1974). If the action "is in essence one for the recovery of money from the state," then the State is the "real, substantial party in interest and is entitled to invoke its sovereign immunity from suit even though the individual officials are nominal defendants." *Id.* Accordingly, absent waiver or a valid congressional abrogation, sovereign immunity prohibits federal courts from awarding retrospective

monetary relief payable from the state treasury, even in the context of individual-capacity claims. *See Harvey v. Williams*, 680 F. Supp. 318, 320–21 (E.D. Ark. 1988) (barring individual-capacity claim because "any claim for back pay" is "barred by the Eleventh Amendment if it is to be paid from the state treasury"); *see also Henley v. Simpson,* 527 F. App'x 303, 307 (5th Cir. 2013) (per curiam) (barring individual-capacity claims because "the payment of any wages owed Plaintiffs must ultimately come from the State treasury"). These sovereign-immunity principles bar Branch's claims for monetary relief here.

Branch seeks back pay, front pay, lost employment benefits, retirement contributions, and other monetary relief arising from her alleged suspension and termination. ECF No. 1 at 18–19. But if awarded, this requested monetary relief would come from the University of Arkansas, not Crawford and Drale.[6] After all, University of Arkansas employees' wages are not paid by Crawford and Drale themselves; rather, they are paid by the University itself. *See Omosegbon v. Wells*, 335 F.3d 668, 673 (7th Cir. 2003) (concluding fired university professor's individual-capacity claims for monetary relief based on alleged wrongful termination were barred by sovereign immunity because any damages "w[ould] be paid by the state rather than the individual defendants"); *Fred v. Aponte Roque*, 916 F.2d 37, 38 n.2 (1st Cir. 1990) (reasoning that a defendant cannot "be held liable in his *individual* capacity for the back pay award, which, in any event must be paid by or on behalf of the employer by definition" (internal quotation marks omitted)). So regardless of how Branch's monetary requests are characterized, any award would necessarily be paid by the University of Arkansas, an instrumentality of the State of Arkansas, rather than by Crawford or Drale personally.

---

[6] To the extent that Branch's complaint could be construed as requesting these same damages from Griffin, the same reasoning applies to him too.

Thus, the State—not the individual defendants—is the real party in interest, and her retrospective monetary claims are barred by sovereign immunity.

Likewise, Branch's claim for "front-pay" is similarly barred by sovereign immunity. The Eighth Circuit recently reaffirmed that plaintiffs may not evade sovereign immunity by styling retrospective monetary relief as prospective equitable relief. *See Smith*, 139 F.4th at 637. Although the *Smith* plaintiff characterized her request as forward-looking injunctive relief, the court concluded that "the core of her request entails nothing more than retroactive monetary reimbursement," which falls outside the *Ex parte Young* exception. *Id.* Here, Branch's request for front-pay in lieu of reinstatement is not properly characterized as prospective relief. *See Campbell v. Ark. Dep't of Corr.*, 155 F.3d 950, 962 (8th Cir. 1998) (holding that front pay is not prospective relief and similarly barred by the Eleventh Amendment).

Branch's requests for back pay, front pay, lost benefits, retirement contributions, and other compensation likewise seek retrospective monetary reimbursement for an alleged past injury. Because those requests would require payment from the State's treasury, they are claims against the State itself and are barred by sovereign immunity. Accordingly, the Court lacks jurisdiction over Branch's request for monetary relief against Crawford and Drale, in their official and individual capacities.

## II.    BRANCH FAILS TO STATE A FIRST AMENDMENT RETALIATION CLAIM.

Not only should Branch's claims be dismissed based on the Court's lack of jurisdiction, but they also should be dismissed because Branch failed to state a claim for First Amendment retaliation. A public employee's free speech rights are "not absolute." *Bartlett v. Fisher*, 972 F.2d 911, 916 (8th Cir. 1992). This is because public employees "often occupy trusted positions in

society" and their expression of "views that contravene governmental policies or impair the proper performance of governmental functions" may be subject to limitation. *Garcetti v. Ceballos*, 547 U.S. 410, 418–19 (2006).

Therefore, in the public-employment context, the employer may have a "significant degree of control over their employees' words and actions" in order to provide efficient public services. *Id*. at 418. Consequently, courts give a "wide degree of deference" to public employers' management of their personnel and internal affairs. *Connick v. Myers,* 461 U.S. 138, 152 (1983). This deference extends not only to speech that has caused actual disruption but also to "employers' reasonable predictions of disruption." *Waters v. Churchill*, 511 U.S. 661, 673 (1994) (plurality opinion). In other words, "[a]n employer need not allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action." *Henry v. Johnson*, 950 F.3d 1005, 1012 (8th Cir. 2020) (internal quotations marks omitted).

When an employee brings a First Amendment retaliation claim in a public-employment context, courts must strike a "balance" between the employee's interests, "as a citizen, in commenting upon matters of public concern" and the government's competing interest, "as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968). This is known as the *Pickering* balancing test. In applying *Pickering*, courts engage in a two-step inquiry. *Washington v. Normandy Fire Prot. Dist.*, 328 F.3d 400, 404 (8th Cir. 2003). First, "the court determines whether the employee's speech can be fairly characterized as constituting speech on a matter of public concern." *Id*. (internal quotation marks omitted). If the speech is a matter of public concern, the court must then "balance[ ] the interests of the employee, as a citizen, in commenting upon matters of public

14

concern and the interests of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.* (cleaned up). The Court "should resolve each of these questions as a matter of law." *Id.*

> **A.      The Court may resolve the *Pickering* balancing test now, at the pleading stage, because the Complaint alleges the facts necessary to conduct the analysis.**

Branch's own allegations indicate that *Pickering* balancing applies and that her termination was constitutional. While the *Pickering* analysis is sometimes better reserved for the summary-judgment stage, such as where the complaint itself does not allege any disruption occurred, "if a plaintiff pleads her way into *Pickering* balancing," the court may conduct that analysis at the motion-to-dismiss stage. *Garza v. Escobar,* 972 F.3d 721, 728 (5th Cir. 2020). In those circumstances, courts dismiss First Amendment retaliation claims at the pleading stage when the competing interests under *Pickering* weigh in the defendant's favor. *See Mule v. Dep't of Educ. of the City of N.Y.*, 797 F.Supp.3d 9, 41 (E.D.N.Y. 2025) (dismissing plaintiff's First Amendment retaliation claim after conducting *Pickering* analysis at motion-to-dismiss stage); *Heller v. Bedford Cent. Sch. Dist.*, 665 F. App'x 49, 51 (2d Cir. 2016) (affirming dismissal after consideration of *Pickering* balancing).

Branch has pleaded her way into the *Pickering* inquiry at the motion-to-dismiss stage. For starters, the Complaint expressly identifies the "framework set out in *Pickering*" as governing this case. ECF 1, ¶ 79. What's more, Branch alleges that Defendants specifically invoked disruption as a justification for her termination, ECF 1, ¶ 60, 66, admits that "some actual disruption existed," *id.* ¶ 5, and explores exactly how that disruption played out in the Complaint. Branch alleges that the University received complaints from students, parents, alumni, legislators, constitutional officers, appointed officials, and other citizens. *Id.* ¶¶ 35, 41, 53, 60. She alleges that the controversy became "a significant reputational and communications crisis," *id.* ¶ 40, and an "externally

amplified event," *id.* ¶ 44. She alleges that her suspension pending the investigation affected clinic operations, *id.* ¶ 42, and alleged that the public controversy "caused the disruption," *id.* ¶ 56. In fact, she alleges that the dismissal letter *itself* relief on the complaints that came from students, parents, alumni, statewide officials, legislators, and citizens, in addition to a disruption of "the operation and effectiveness of the law school and the Low-Income Taxpayer clinic." *Id.* ¶ 60, 66. And Branch herself acknowledges that the University identified "some actual operational concerns after Branch was suspended, particularly with respect to the Low-Income Taxpayer Clinic." *Id.* ¶ 70.

The Complaint also describes the University's response to those concerns in detail. Branch alleges that she was placed on paid administrative suspension while the University investigated the matter. *Id.* ¶ 41. She alleges that she was interviewed, informed of the grounds under consideration, and given an opportunity to respond before a final employment decision was made. *Id.* ¶¶ 47, 52–53. She further alleges that a faculty panel reviewed the discipline and *agreed* that some sanction was warranted, although the panel recommended a lesser penalty. *Id.* ¶¶ 57, 63. The Chancellor then reviewed the matter and affirmed the termination decision. *Id.* ¶¶ 65–68.

Thus, unlike a complaint that leaves the employer's asserted interests and the alleged workplace effects undeveloped, Branch's Complaint places those matters squarely before the Court. She alleges the existence of actual disruption, student complaints, operational concerns, and a disciplinary process directed at evaluating those concerns. Those allegations are the circumstances relevant to *Pickering* balancing—and the Complaint itself identifies *Pickering* as controlling. *Id.* ¶ 79. Because Branch's allegations (both implicitly and expressly) invite the Court to perform the *Pickering* analysis, the Court may determine at the Rule 12 stage whether they

plausibly establish that her speech interests outweighed the University's interests. As explained

below, even taking all the allegations set forth a true, they fail to state a claim for First Amendment

retaliation.

> **B.    Branch's allegations establish that the University's interests outweighed her speech interests under *Pickering*.**

Even if Branch engaged in speech on a matter of public concern,[7] her Complaint

nevertheless establishes that the University's interests outweighed her asserted speech interests.

In determining whether a public employer's interests outweigh an employee's interest in

speaking, the Eighth Circuit considers several interrelated factors, including:

> (1) the need for harmony in the office or work place; (2) whether the government's responsibilities require a close working relationship to exist between the plaintiff and co-workers when the speech in question has caused or could cause the relationship to deteriorate; (3) the time, manner, and place of the speech; (4) the context in which the dispute arose; (5) the degree of public interest in the speech; and (6) whether the speech impeded the employee's ability to perform his or her duties.

*Shands v. City of Kennett*, 993 F.2d 1337, 1344 (8th Cir. 1993) (quoting *Bowman v. Pulaski Cnty.*

*Special Sch. Dist.*, 723 F.2d 640, 644 (8th Cir. 1983)). Those factors all favor the University here.

"In the public education context, the critical focus of each factor is the effective functioning

of the public employer's enterprise." *Hedgepeth v. Britton*, 152 F.4th 789, 796 (7th Cir. 2025), *cert.*

*denied*, 224 L. Ed. 2d 831 (May 18, 2026) (internal quotation marks omitted). Importantly, public

employers "enjoy more leeway in restricting the speech of a public-facing employee like a

---

[7] If the Complaint does not embrace the contents of Branch's posts as argued above, *see supra* note 4, then Branch has failed to allege facts, as opposed to simply a legal conclusion, that she spoke as a citizen on a matter of public concern. That's because whether speech addresses a matter of public concern is a context-specific question of law. *Connick*, 461 U.S. at 146–48. Therefore, if this Court does not take judicial notice of the government website or view the posts as incorporated into the Complaint, then Branch has failed to describe their contents with any specificity that would allow the court to conclude they are a matter of public concern.

classroom teacher who must maintain public trust and respect to be effective." *Id.* (internal quotation marks omitted); *Patterson v. Masem*, 774 F.2d 251, 257 (8th Cir. 1985). Here, not only was Branch a classroom instructor, she also served as Director of the Low-Income Taxpayer Clinic, supervised law students representing clients, managed the Clinic's operations, conducted community outreach, and administered a federally funded legal program. *Id.* ¶¶ 20–24. Those responsibilities required close and effective working relationships with students, faculty, clients, courts, and the broader legal community. Accordingly, courts have recognized that a public educational institution may consider whether a faculty member's conduct compromises the learning environment or undermines students' confidence in the educational process. *Melzer v. Bd. of Educ. of City Sch. Dist. of City of N.Y.*, 336 F.3d 185, 199 (2d Cir. 2003). Branch's conduct did so here.

Indeed, Branch's allegations expressly acknowledge that "some actual disruption existed," ECF No. 1 ¶ 5, and she admits numerous complaints from numerous sources were submitted about her. She specifically alleges that the University received complaints from students, parents, alumni, legislators, constitutional officers, and members of the public concerning her continued employment. *Id.* ¶¶ 35, 41, 53, 60. According to the Complaint, University officials concluded that Branch's Facebook posts had disrupted the operation and effectiveness of both the Bowen School of Law and the Low-Income Taxpayer Clinic and identified "some actual operational concerns" arising from the controversy. *Id.* ¶¶ 60, 70. And Branch alleges that students and parents complained about her continued employment, and that the University considered those complaints during its disciplinary process. *Id.* ¶¶ 35, 53, 60. As *Melzer* observed, those participating in the educational process "are not outsiders seeking to heckle [the plaintiff] into silence; rather they are

participants in public education, without whose cooperation public education as a practical matter cannot function." 336 F.3d at 199. In a law school setting, the confidence of students, alumni, members of the bench and bar, and the public is essential to the institution's ability to recruit students, maintain alumni engagement, operate clinical programs, and prepare future attorneys. Branch's own allegations establish that those constituencies questioned her continued role as an instructor and clinical director. These allegations directly implicate the governmental interests recognized in *Pickering*—maintaining effective operations, preserving workplace harmony, and ensuring the successful performance of the University's educational mission.

Nor were the University's interests limited to maintaining day-to-day operations. The Complaint alleges a controversy that generated widespread public attention and directly implicated Bowen Law School's reputation within the legal and general community. ECF 1, ¶¶ 35, 40, 41, 53, 69.   Indeed, Branch herself explains that her posts generated a full-blown and "significant reputational and communications crisis." *Id.* ¶ 40. And the Eighth Circuit has recognized that "[a] public employee's exercise of free speech rights affects the efficiency of the operation of the public service when it affects the morale of the work force and damages the program's reputation." *Grantham v. Trickey*, 21 F.3d 289, 295 (8th Cir. 1994). Therefore, in conducting the *Pickering* analysis, "[a] public employer's reputational interests are a valid part of the balancing inquiry." *Schneiter v. Carr*, 148 F.4th 438, 449 (7th Cir. 2025); *see Trejo v. Shoben*, 319 F.3d 878, 888 (7th Cir. 2003) ("It goes without saying that a university has an interest in fostering a collegial educational environment while doing everything within its power to maintain its reputation in the academic community both on campus and around the nation."); *McDaniels v. Flick*, 59 F.3d 446, 456 (3d Cir. 1995) (explaining that college "ha[d] a great interest in preserving its reputation"). In the context

of a public law school, the reputation of its faculty and clinical programs bears directly on the institution's ability to carry out its educational mission and can affect students' employment prospects as well.[8] The University's reputational interests therefore directly implicate its ability to successfully carry out its mission—making the University's response to the "crisis" Branch's posts caused entirely appropriate and constitutional. ECF 1, ¶40. *See Locurto v. Giuliani*, 447 F.3d 159, 179 (2d Cir. 2006) ("[A] government employer may, in termination decisions, take into account the public's perception of employees whose jobs necessarily bring them into extensive public contact.").

As the University continued to receive complaints "asserting that Branch's posts made her unfit for public education or made the institution appear unsafe or professionally compromised," ECF 1, ¶ 41, the University was not required to wait for "events to unfold to the extent that the disruption of the office and the destruction of working relationship" was fully "manifest[ed] before taking action," *Nord v. Walsh County*, 757 F.3d 734, 743 (8th Cir. 2014) (quoting *Connick*, 461 U.S. at 152); *see Anzaldua v. Ne. Ambulance & Fire Prot. Dist.*, 793 F.3d 822, 834 n.3 (8th Cir. 2015). As the Eighth Circuit recently reaffirmed, "[s]ometimes a government employer will experience actual disruption. Other times, it will have a reasonable belief in the potential for disruption." *Melton v. City of Forrest City*, 147 F.4th 896, 903 (8th Cir. 2025) (cleaned up). Branch's Complaint alleges

---

[8] "For instance, in recent years, several prominent federal judges announced that they wouldn't hire graduates of certain law schools based on concerns about the schools' handling of various controversies. *See* Debra Cassens Weiss, *University is 'incubator of bigotry,' say 13 federal judges boycotting grads*, ABA Journal (May 7, 2024), https://www.abajournal.com/news/article/university-is-an-incubator-of-bigotry-say-13-federal-judges-who-are-boycotting-its-grads?utm_source=sfmc&utm_medium=email&utm_campaign=weekly_email&promo=&utm_id=843750&sfmc_id=128288483#google_vignette. Likewise, top law firms have rescinded offers to law students based on their involvement in similar campus controversies. *See, e.g.*, Adam Gabbatt, *Leading US law firm says it rescinded job offers to students who backed Israel-Hamas letters*, The Guardian (Oct. 18, 2023), https://www.theguardian.com/us-news/2023/oct/18/student-palestine-letter-harvard-columbia-us-law-firm-jobs-revoked.

both. Beyond acknowledging actual disruption, she also alleges that students and parents questioned her continued employment, that University officials concluded her conduct had disrupted Bowen Law School and the Clinic, and that even the Faculty Appeals Panel determined that her conduct constituted a "mistake" warranting discipline, differing only as to whether dismissal was the appropriate sanction. ECF No. 1 ¶¶ 35, 53, 57, 60, 63. Those allegations demonstrate that concerns regarding Branch's conduct were shared by individuals central to Bowen Law School's educational mission and provided ample grounds for the University to conclude that her continued service as Director of the Low-Income Taxpayer Clinic posed a substantial risk of continued disruption to student relationships and her public-facing position as a professor at the University.

The allegations here closely resemble those in *Hedgepeth*, where the Seventh Circuit concluded that a school district's interests outweighed a teacher's speech interest under *Pickering*. 152 F.4th at 797–799. There, a teacher's Facebook posts spread throughout the school community, generated substantial public controversy, prompted complaints from students, parents, and staff, attracted media attention, and disrupted the district's operations. *Id.* at 797. The court emphasized that the "disruption was not limited to [the school's] students" and that the "posts sparked outrage, drew media attention, and forced the District into a costly and time consuming public relations response." *Id.* at 797. Similar disruptions occurred here. According to the Complaint, her posts generated complaints from students, parents, alumni, legislators, constitutional officers, and members of the public; prompted an internal investigation and disciplinary proceedings; and raised concerns regarding her continued effectiveness as both a professor and the Director of a student-

facing clinical program. ECF 1, ¶¶ 35–40, 52–53, 60, 70, 84, 107. Accepting those allegations as true, the University's interests are at least as compelling as those recognized in *Hedgepeth*.

In contrast, this case bears little resemblance to *Rankin v. McPherson*, 483 US 378 (1987), where the Supreme Court held that *Pickering* favored the employee. The employee in *Rankin* was a clerical worker whose private remark to a coworker neither became the subject of widespread public controversy nor impaired the efficient operation of the office. *Id.* at 388–92. Nor is this case analogous to *Melton.* There, the court ultimately concluded that the employer had not established sufficient interests that outweighed the employee's First Amendment interests, noting that "[n]o current firefighter" complained about the plaintiff's social media posts. *Melton,* 147 F.4th at 902–04. Here, by contrast, Branch's own Complaint affirmatively alleges a plethora of complaints, actual disruption and a reasonable basis to anticipate continued disruption.

Accordingly, even accepting the Complaint's factual allegations as true, Branch's First Amendment retaliation claim fails under *Pickering* balancing. Her own allegations establish that the University's compelling interests in preserving the effective operation and reputation of the Bowen School of Law, maintaining productive relationships with students and the legal community, protecting the integrity of its clinical programs, and avoiding further disruption outweighed her asserted interest in making the Facebook posts at issue. Dismissal of her First Amendment retaliation claim is therefore warranted.[9]

---

[9] The Complaint also labels Branch's First Amendment claim as one for "First Amendment Retaliation/Viewpoint termination." ECF No. 1, at 12. But merely using the phrase "viewpoint discrimination" does not create an independent constitutional claim. The Complaint does not identify any government policy, regulation, licensing decision, public forum, or other governmental restriction on speech based upon viewpoint. Nor does it plead the elements of a standalone viewpoint-discrimination claim. Accordingly, the Court should analyze Branch's First Amendment allegations exclusively under the *Pickering* framework discussed above, which Branch herself admits governs. *See* ECF 1, ¶ 79.

III.    **CRAWFORD AND DRALE ARE ENTITLED TO QUALIFIED IMMUNITY ON THE INDIVIDUAL-CAPACITY CLAIMS.**

A.    **Branch has failed to allege the violation of a constitutional right.**

Qualified immunity shields government officials performing discretionary functions from individual liability unless a plaintiff demonstrates both the violation of a constitutional right and that the right was clearly established at the time of the challenged conduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). Courts may address either prong first, and if the plaintiff fails to satisfy either, qualified immunity applies. *Id.* at 236.

As discussed above, Branch has failed to plausibly allege that Crawford or Drale violated her First Amendment rights. Branch's own allegations establish that the University's interests outweighed her asserted speech interests under *Pickering*. *See supra* 15-20. Accordingly, because the Complaint fails to allege the violation of a constitutional right, Crawford and Drale are entitled to qualified immunity.

B.    **Alternatively, any constitutional right was not clearly established.**

Even assuming Branch has plausibly alleged a constitutional violation, Crawford and Drale are independently entitled to qualified immunity because the alleged constitutional right was not clearly established. A government official violates clearly established law only when, at the time of the challenged conduct, "the contours of [the] right [are] sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Qualified immunity affords government officials "breathing room to make reasonable but mistaken judgments about open legal questions" and protects "all but the plainly incompetent or those who knowingly violate the law." *Id.* at 743 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

23

Accordingly, "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* at 741. Courts may "not define clearly established law at a high level of generality." *Id.* Rather, the Supreme Court recently reaffirmed that courts generally "need to identify a case where an officer acting under similar circumstances was held to have violated the Constitution." *Zorn v. Linton*, 146 S. Ct. 926, 930 (2026) (per curiam) (cleaned up). Put differently, "officers receive qualified immunity unless they could have read the relevant precedent beforehand and known that it proscribed their specific conduct." *Id.* (cleaned up).

That demanding standard is particularly significant in cases governed by *Pickering*. Unlike constitutional rules that admit bright-line application, *Pickering* requires courts to engage in a fact-intensive balancing of competing governmental and private interests. Recognizing the inherently context-specific nature of that inquiry, the Eighth Circuit has held that "[b]ecause *Pickering*'s constitutional rule turns upon a fact-intensive balancing test, it can rarely be considered 'clearly established' for purposes of ... qualified immunity." *Hemminghaus v. Missouri*, 756 F.3d 1100, 1114 (8th Cir. 2014). Likewise, where a public employer demonstrates sufficient disruption to implicate *Pickering*, qualified immunity ordinarily follows because reasonable officials may disagree regarding how the balance should be struck. *See Grantham*, 21 F.3d at 293. These decisions underscore that the qualified-immunity inquiry in the *Pickering* context necessarily turns on the particular facts confronting the government official.

The clearly established right at issue cannot be defined, as Branch does, as the general right of a public employee to speak on matters of public concern. ECF 1, ¶ 94. When evaluating the application of qualified immunity, "rights are not defined at a broad level of generality." *Perry v. Adams*, 993 F.3d 584 (8th Cir. 2021); *Engleman v. Deputy Murray*, 546 F.3d 944, 949 n.4 (8th Cir.

24

2008) ("The Supreme Court has clearly stated that in establishing qualified immunity, the test must be applied at a level of specificity that approximates the actual circumstances of the case."). In other words, "circuit precedent that involves sufficiently similar facts to squarely govern [Defendants'] conduct in the specific circumstances at issue." *Perry*, 993 F.3d at 587 (quoting *Graham v. Barnette*, 970 F.3d 1075, 1090 (8th Cir. 2020)). Therefore, the relevant inquiry is whether it was clearly established that university officials violate the First Amendment by terminating a clinical law professor after her personal social media activity that celebrated a person's political assassination generated substantial complaints from students, parents, alumni, public officials, and others, and the officials reasonably concluded that the resulting controversy disrupted—or threatened to disrupt—the operation of the law school and its clinical program. Branch identifies no precedent answering that question in the affirmative.

Instead, Branch identifies two Eighth Circuit decisions that she contends clearly establish her constitutional rights in this context. ECF 1, ¶ 94. Neither does so.  In *Pendleton v. St. Louis County*, 178 F.3d 1007 (8th Cir. 1999), county employees anonymously distributed a fax criticizing members of the county council and were immediately terminated after their identities became known. *Id.* at 1009–10. Unlike this case, *Pendelton* did not involve a public educational institution, a faculty member responsible for teaching and supervising students, or allegations that the employee's speech generated widespread public controversy, prompted complaints from students, parents, alumni, legislators, and members of the public, or disrupted the employer's operations. Accordingly, *Pendleton* does not clearly establish that University officials confronted with the allegations presented here violated the First Amendment by taking disciplinary action. Nor does *Waddell v. Forney*, 108 F.3d 889 (8th Cir. 1997), clearly establish Branch's asserted right. *Waddell*

did not involve a First Amendment retaliation claim or the *Pickering* balancing required for public-employee speech cases. Because it addressed a different constitutional claim under materially different legal standards, it could not have provided fair notice that Defendants' alleged conduct violated the First Amendment.

Branch's own Complaint alleges actual disruption, operational concerns, extensive complaints from constituencies central to the Law School's mission, and multiple levels of institutional review before the decision to terminate was made. *See supra* 15–20. At a minimum, reasonable university officials could believe that disciplinary action in response to an employee's public celebration of a political assassination was constitutional under those circumstances.

Qualified immunity exists precisely to protect officials who must make reasonable judgments in legally uncertain circumstances. *al-Kidd*, 563 U.S. at 743. Even if this Court were ultimately to conclude that Crawford and Drale misjudged the constitutional balance, nothing in existing precedent placed the constitutionality of their conduct "beyond debate." *Id.* at 741. Because reasonable university officials could have believed that terminating Branch under the circumstances alleged in the Complaint complied with the First Amendment, Crawford and Drale are entitled to qualified immunity on the claims made against them in their individual capacities.

Because Branch fails to plausibly allege that Crawford or Drale violated the First Amendment, Branch's claims against them fail regardless of the capacity in which they are sued. The individual-capacity claims are barred by qualified immunity, and the requests for declaratory and prospective equitable relief necessarily fail because the Complaint does not state a constitutional violation.

### IV.    THE INDIVIDUAL CAPACITY CLAIM AGAINST ATTORNEY GENERAL GRIFFIN FAILS.

The First Amendment claim against Attorney General Griffin likewise fails because Branch fails to plausibly allege a violation of the First Amendment, as articulated in *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 191 (2024), and otherwise fails to identify any case law that would have put Griffin on reasonable notice that his conduct under these circumstances violated the First Amendment. Accordingly, the individual-capacity claim against Griffin should be dismissed for failure to state a claim and in accordance with the application of qualified immunity.

### A.    Branch fails to plausibly allege that Griffin violated the First Amendment.

To state a claim that Griffin violated the First Amendment through coercion to a third-party, Branch "must plausibly allege conduct that, viewed in context, could be reasonably understood to convey a threat of adverse government action in order to punish or suppress the plaintiff's speech." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 191 (2024) (citing *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67–68 (1963)). In analyzing whether coercion occurred, courts consider the official's governmental authority, the nature of the challenged communications, and the surrounding context, including how the recipient reasonably understood and responded to those communications. *Id.* at 191–93. Branch's allegations fail under each consideration.

First, unlike the defendants in *Vullo* and *Bantam Books*, Branch does not allege that Griffin possessed any governmental authority over the University of Arkansas at Little Rock or over her employment. In contrast, the Supreme Court emphasized the defendant in *Vullo* exercised "direct regulatory and enforcement authority" over the regulated entities and could initiate investigations, refer matters for prosecution, pursue civil enforcement actions, and impose significant monetary penalties. *Id.* at 192. Likewise, the commission in *Bantam Books* coupled its notices with threats of

criminal prosecution and follow-up police visits, thereby leveraging the State's enforcement authority to suppress protected speech. 372 U.S. at 67–68. Those governmental powers gave the challenged communications their coercive force.

Branch alleges nothing remotely comparable here. Indeed, Branch expressly acknowledges that Griffin "was not Branch's employer and was not the final decisionmaker with respect to her suspension or dismissal." ECF No. 1, ¶ 104. She likewise admits that Griffin was entitled to "hold opinions or express disagreement with her speech." *Id.* at ¶ 103. Instead, Branch alleges only that Griffin used "the authority, prestige, and amplification power" of his office to intensify public pressure on University officials. *Id.* at ¶ 104. But broad political influence is not governmental coercion. Absent plausible allegations that Griffin possessed authority to regulate, supervise, investigate, sanction, or otherwise compel the University's employment decisions, the Complaint does not allege the type of governmental power that rendered the communications in *Vullo* and *Bantam Books* coercive.

Second, Branch fails to allege that Griffin communicated any threat of adverse governmental action or any governmental inducement. In *Vullo*, the defendant allegedly warned regulated entities that enforcement actions would follow if they continued doing business with organizations associated with the NRA, while simultaneously suggesting that favorable regulatory treatment would accompany compliance. 602 U.S. at 192–93. The alleged communications were thus an open threat backed by the State's enforcement authority.

No comparable allegations appear here. Branch does not allege that Griffin threatened the University with investigation, prosecution, regulatory action, loss of funding, litigation, or any other adverse governmental consequence if it declined to discipline her. Nor does she allege that

Griffin offered any governmental benefit if the University complied with his views. Rather, the Complaint alleges only that Griffin publicly criticized Branch's "unabashedly celebrating political assassination" and expressed the opinion that the University should take disciplinary action. ECF No. 1 ¶¶ 37–38, 37 n.1. Even accepting those allegations as true, public criticism by an elected official—even forceful criticism—does not become unconstitutional coercion merely because the official occupies a prominent public office. *See Vullo*, 602 U.S. at 188 ("A government official can share [his] views freely and criticize particular beliefs, and [he] can do so forcefully in the hopes of persuading others to follow [his] lead."). In fact, to hold otherwise, would infringe on Griffin's own First Amendment right to express his opinion regarding Branch's posts. *See* ECF 1, ¶ 103 (acknowledging that Attorney General Griffin may "hold opinions or express disagreement with her speech"). As there is no unconstitutional use of authority or power alleged in Branch's complaint, all that is left is Griffin's exercise of his First Amendment rights to share his views in the public sphere.

The context alleged in the Complaint likewise defeats any plausible inference of coercion. *Vullo* instructs courts to consider how the recipient reasonably understood and reacted to the challenged communication. *Vullo,* 602 U.S. at 191–93. Here, Griffin's alleged statements were made through a public press release addressed to the public at large—not through a private communication directed to University officials and backed by governmental authority. That distinction is significant. Unlike the private communications between a regulator and regulated entities in *Vullo*, or the enforcement notices at issue in *Bantam Books*, Griffin's alleged statements were public expressions of opinion rather than directives issued to an entity subject to his control.

The Complaint further undermines any inference that Griffin's statements carried coercive force by alleging that criticism of Branch came from numerous sources—not merely Griffin. Branch alleges that the Governor, the Lieutenant Governor, legislators, students, parents, alumni, constitutional officers, and members of the public all voiced concerns regarding her social media activity. ECF No. 1 ¶¶ 35, 36, 39. Yet Branch names only Griffin as a defendant based on these public statements. These allegations do not plausibly suggest that the University viewed Griffin's press release as a governmental directive backed by the threat of adverse state action. Rather, they depict Griffin as one participant in a broader public debate surrounding Branch's conduct.

That broader context is significant. The Complaint alleges that the University did not simply react to Griffin's statements. Instead, it conducted its own investigation, placed Branch on administrative leave, provided her an opportunity to respond, considered the matter through multiple levels of internal review, and ultimately based its decision on widespread complaints, disruption to the Law School and the Low-Income Taxpayer Clinic, and standards of professionalism held by professors at the University. *Id.* ¶¶ 41–42, 47, 51–66. Those allegations describe an institution exercising independent judgment in response to a multifaceted controversy—not one capitulating to a coercive demand from the Attorney General.

Indeed, Branch expressly alleges that Griffin "was not the sole cause of the adverse action," "does not allege that Griffin alone fired her," and instead contends only that Griffin only contributed to "the retaliatory environment" that ultimately culminated in her dismissal. *Id.* ¶¶ 109, 111. She further alleges that Griffin's statements were not made in connection with any prosecutorial proceeding or exercise of enforcement authority. *Id.* ¶ 112. Taken as true, these allegations establish only that Griffin publicly expressed his views and became one voice among

30

many in a broader public controversy that the University independently evaluated before reaching its own employment decision. They do not plausibly allege the coercive exercise of governmental authority prohibited by *Vullo* and *Bantam Books*.

Accordingly, Branch has failed to plausibly allege that Griffin violated the First Amendment through unconstitutional coercion. Because the Complaint alleges neither governmental authority, coercive threats, nor a recipient's response indicative of governmental compulsion, it fails to state a claim under *Vullo*. *See McCartney v. City of Welcome*, No. CV 25-2245 (MJD/DJF), 2026 WL 1674133, at *5 (D. Minn. June 10, 2026) (dismissing a *Vullo* claim where the complaint lacked "any plausible allegation of threatened adverse consequence").

### B.    Griffin is entitled to qualified immunity.

Even assuming that Branch has plausibly alleged a constitutional violation, Griffin is entitled to qualified immunity. As discussed above, government officials are entitled to qualified immunity unless existing precedent placed the constitutional question "beyond debate" such that every reasonable official would have understood that the challenged conduct violated the Constitution. *al-Kidd*, 563 U.S. at 741. Courts may not define the asserted constitutional right "at a high level of generality," but instead must identify precedent addressing officials acting under similar circumstances. *Id.*; *Zorn*, 146 S. Ct. at 930. Such was the case in *Vullo* itself, where actual coercion occurred. On remand from the Supreme Court, the Second Circuit held that despite the NRA having "plausibly alleged that Vullo violated its First Amendment rights," the defendants were nevertheless entitled to qualified immunity. *Nat'l Rifle Ass'n of Am. v. Vullo*, 144 F.4th 376, 389–91 (2d Cir. 2025), *cert. denied*, 146 S. Ct. 1628 (2026). In particular, the court reasoned that there was "no case (or set of cases)" that clearly established "that exercising regulatory power to

31

pressure third-party regulated entities into refraining from non[-]expressive activity and disassociating from plaintiff crossed the line from persuasion into impermissible coercion and retaliation." *Id.* at 391.

In similar fashion, Branch is unable to identify a single case with factually similar circumstances that would have put Griffin on notice that his conduct was unconstitutional. The right asserted here cannot be framed generally as the right to be free from retaliation for protected speech. *See supra* 22–23. Therefore, the relevant inquiry is whether it was clearly established that an Attorney General violates the First Amendment by issuing a public press release criticizing a university employee's speech and urging a public university to consider disciplinary action, where the Attorney General possessed no authority over the employee's employment, made no threat of governmental enforcement or regulatory action, and the university ultimately reached its own employment decision following an independent investigation and internal review.

Branch identifies no cases at all that clearly establish this right, much less any Supreme Court or Eighth Circuit decision answering that question in the affirmative. To the contrary, *Vullo* makes clear that unconstitutional coercion depends upon the use of governmental authority to communicate threats of adverse governmental consequences. 602 U.S. at 191–93. As discussed above, Branch expressly alleges that Griffin was not her employer, was not the University's final decisionmaker, possessed no authority to terminate her employment, and merely expressed his opinions publicly concerning her conduct. ECF No. 1, ¶¶ 103–04. She further alleges that Griffin's statements were not made in connection with any prosecutorial proceeding or exercise of enforcement authority. *Id.* ¶ 112. At a minimum, reasonable officials could disagree about whether such alleged conduct crossed the constitutional line identified in *Vullo*.

32

Qualified immunity exists precisely to protect officials required to make reasonable judgments in unsettled areas of constitutional law. *al-Kidd,* 563 U.S. at 743. Reasonable officials, at a minimum, could disagree about whether Griffin's alleged conduct constituted unconstitutional coercion under *Vullo*. Because existing precedent did not place the constitutionality of Griffin's conduct beyond debate, Griffin is entitled to qualified immunity, and the individual-capacity claim against him should be dismissed.

Accordingly, the claim against Griffin fails for multiple independent reasons. The Complaint does not plausibly allege that Griffin exercised coercive governmental authority prohibited by *Vullo*, nor does it plausibly allege that his public statements caused the University's employment decision. Even if the Court were to conclude otherwise, no clearly established law would have informed a reasonable Attorney General that issuing a public press release under the circumstances alleged in the Complaint violated the First Amendment. The individual-capacity claim against Griffin should therefore be dismissed.

## CONCLUSION

The Court lacks jurisdiction over most of Branch's claims, as they are either moot or barred by sovereign immunity. On the merits, Branch has failed to plausibly allege that Crawford or Drale violated the First Amendment. She likewise failed to state a claim against Griffin because she does not plausibly allege unconstitutional coercion. Moreover, Crawford, Drale, and Griffin are each entitled to qualified immunity because no clearly established law would have informed a reasonable official that the conduct alleged in the Complaint violated the First Amendment. Accordingly, Official-Defendants respectfully request that the Court dismiss all claims asserted against them

under Rule 12(b)(1) and 12(b)(6) and award such other and further relief as the Court deems just and proper.

                              Respectfully submitted,

                              TIM GRIFFIN
                              Attorney General

By:     Ryan Hale
         Ark. Bar No. 2024310
         Senior Assistant Attorney General

         Jordan Broyles
         Ark. Bar No. 2015156
         Senior Assistant Attorney General

         Madalyn Goolsby
         Ark. Bar No. 2024283
         Assistant Attorney General

         Arkansas Attorney General's Office
         101 West Capitol Avenue
         Little Rock, AR 72201
         (501) 295-7419
         (501) 682-2591 fax
         ryan.hale@arkansasag.gov

         *Counsel for Defendants*