**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**CENTRAL DIVISION**

---

**FELICIA BRANCH,**
**PLAINTIFF**

**v.** **CASE NO.: 4:26-CV-00535-JM**

**Board of Trustees of the University of Arkansas,**

**COLIN CRAWFORD,**
**in his individual and official capacities;**
**CHRISTINA S. DRALE,**
**in her individual and official capacities; and**
**TIM GRIFFIN,**
**in his individual capacity,**

**DEFENDANTS**

---

**FIRST AMENDED COMPLAINT**
**JURY TRIAL DEMANDED**

---

Plaintiff, FELICIA BRANCH, complaining of the Defendants, alleges and says:

## PARTIES

1. Plaintiff Felicia Branch is a resident of Pulaski County, Arkansas, and has been for more than six months.

2. From July 1, 2025, until her termination in September 2025, Branch served as Assistant Professor of Clinical Education and Director of the Low-Income Taxpayer Clinic at the William H. Bowen School of Law at the University of Arkansas at Little Rock.

3. Defendant Colin Crawford was, at all relevant times, Dean and Professor of Law at the William H. Bowen School of Law. He is a resident of Arkansas, and his place of business is located at 1201 McMath Avenue, Little Rock, Arkansas 72202 in Pulaski County. He is sued in his individual capacity for damages and in his official capacity for declaratory and prospective injunctive relief.

4. Defendant Christina S. Drale was, at all relevant times, Chancellor of the University of Arkansas at Little Rock. She is a resident of Arkansas, and her place of business is located at Charles Donaldson Student Services Center Ste. 423, 2801 S. University Ave., Little Rock, Arkansas 72204. She is sued in her individual capacity for damages and in her official capacity for declaratory and prospective injunctive relief.

5. Defendant Christian S. Drale was appointed by the University of Arkansas Board of Trustees in September 2019. She is sued in her individual and official capacity. Arkansas Gov. Sarah Huckabee Sanders has the power to appoint members to the Board of Trustees of the University of Arkansas. Arkansas Gov. Sarah Huckabee wrote posts about Branch, issued a public statement, and applied extreme public and political pressure to cause the termination of Branch, and to silence her freedom of speech.

6. Defendant Tim Griffin was, at all relevant times, Attorney General of the State of Arkansas. He is a resident of Arkansas, and his place of business is located at 323 Center Street, Ste. 200, Little Rock, Arkansas 72201. He is sued in his individual capacity only.

7. Defendant Board of Trustees of the University of Arkansas established and governs UALR. UALR is a component of the University of Arkansas. Arkansas state law designates

the Board of Trustees of the University of Arkansas as the entity capable of being sued. University of Arkansas at Little Rock is a public university located at 2801 S. University Ave., Little Rock, Arkansas 72204. The William H. Bowen School of Law is a school within UA Little Rock and is not a separate entity from UA Little Rock. Board of Trustees of the University of Arkansas hereinafter shall be described as "UA or UALR" as the operations of each are controlled and operated by the Brd. of Trustees.

8. At all relevant times, Defendants Colin Crawford and Christina S. Drale were employees of UA Little Rock serving in different duty posts, with Crawford serving as Dean and Professor of Law at the William H. Bowen School of Law and Drale serving as Chancellor of UA Little Rock.

9. UALR, as a part of the University of Arkansas system, receives substantial non-state funding, including federal grants for its Low-Income Taxpayer Clinic program and other federally funded programs. These federal funds are conditioned upon compliance with federal civil-rights laws, including laws prohibiting retaliation for protected speech.

10. The Low-Income Taxpayer Clinic that Branch directed was funded by a federal grant requiring compliance with federal civil-rights statutes, and the organization financial records used for grant-related obligations were UA Little Rock's records.

11. The activities of the Low-Income Taxpayer Clinic are proprietary in nature, involving client representation, service provision, and fee-generating professional activity, rather than traditional governmental functions.

12. UALR's receipt of federal funding and its agreement to comply with federal civil-rights laws as a condition of that funding constitute a waiver of sovereign immunity for claims arising under federal civil-rights statutes, including claims brought under 42 U.S.C. § 1983.

13. UALR is not an arm of the State for Eleventh Amendment purposes because it operates with substantial financial independence from state appropriations, receives significant non-state funding, and conducts proprietary activities subject to federal civil-rights conditions.

**JURISDICTION AND VENUE**

14. This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States, including 42 U.S.C. § 1983. 28 USCS § 1331.

15. This Court also has jurisdiction under 28 U.S.C. § 1343 because this action seeks redress for the deprivation, under color of state law, of rights secured by the Constitution of the United States. 28 USCS § 1343.

16. Plaintiff seeks prospective declaratory and injunctive relief against Defendant UA Little Rock and against Defendants Crawford and Drale in their official capacities for ongoing consequences of unconstitutional conduct, including reinstatement or equivalent prospective relief. Plaintiff seeks monetary damages only against defendants sued in their individual capacities.

17. Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to these claims occurred in this District, and because the defendants relevant to the university employment decision reside or performed the relevant acts in this District. 28 USCS § 1391.

## FACTUAL ALLEGATIONS

### Felicia Branch's Appointment and Role

18. On December 16, 2024, Dean Colin Crawford offered Branch the position of Assistant Professor of Clinical Education and Director of the Low-Income Taxpayer Clinic.

19. Branch was hired into a full-time, 12-month faculty position for $98,000, plus a benefits package and reimbursement for travel and relocation.

20. The employment offer to Branch specifically stated:

> This is a 12-month, full-time position funded by a grant from the IRS Low-Income Taxpayer Clinic Program. This position is not eligible for tenure, but upon completion of certain requirements, the Clinic Director will be eligible for promotion to Associate Professor of Clinical Education, with a three-year term, and subsequent promotion to Professor of Clinical Education, with a five-year term that is presumptively renewable depending on Clinic funding. This position is governed by state and federal laws, and agency/ institution policy.
>
> We will reimburse you for the costs of moving up to the sum of $9,000.00. Reimbursement requires documentation of all costs incurred and moving receipts must be submitted together (one-time only). In addition, should you wish to make a home-hunting trip before July 1, we will reimburse you for that trip up to the sum of $1,500.00. Please remember that both moving and home-hunting reimbursements are taxable income.

21. Her employment materials reflected that the clinic-director role included client representation, law-student supervision, classroom instruction, community outreach and education, and compliance responsibilities connected to the Low-Income Taxpayer Clinic grant program.

22. Branch accepted the position in reliance on Defendants' offer and relocated for the job. Her personnel file reflects a December 16, 2024, offer letter for the Bowen Law position, a July 1, 2025, hire date and first day of work, and a later one-time relocation payment in the amount of $8,212.62 tied to her move for the position.

23. Branch began her employment on July 1, 2025.

24. As Director of the Low-Income Taxpayer Clinic, Branch's position required grant-related reporting to the federal government. The organization financial records used for those grant-related obligations were UA Little Rock's records, not separate financial records of the William H. Bowen School of Law as an independent budget entity.

25. The position was housed within the Bowen School of Law under Dean Colin Crawford's supervisory organization. Branch's personnel file identifies her position as Assistant Professor of Clinical Education within the Bowen School of Law.

26. The position Branch accepted was a clinical faculty position centered on legal education and taxpayer representation. It was not a public-relations post, a communications role, or an office charged with speaking on behalf of the University.

27. Before accepting the Bowen position, Branch had prior teaching and tax-practice experience, including prior law school teaching and tax-law practice.

**Felicia Branch's Off-Duty Speech on Her Personal Facebook Page**

28. In September 2025, after the death of Charlie Kirk, Branch made posts from her personal Facebook page expressing her views about him and related public issues. Kirk was a conservative activist, who founded "Turning Point USA", which lead political attacks on liberal education, Black educators, made multiple statements about Black people such as "moronic Black woman", historically divisive phrases like "boy" in reference to George Floyd and he called the passing of the Civil Rights Act of 1964 "a huge mistake." Kirk declared that black female leaders such as Supreme Court Justice Jackson and Former First Lady Michelle Obama did "not have the brain processing power to otherwise be taken really seriously. You had to go steal a white person's slot to go be taken somewhat seriously."

29. Branch's Facebook page did not identify UA Little Rock as her employer, and she was not speaking on behalf of the University when she made the posts. Her Facebook page did not identify or associate her with the Tax Clinic or as a professor for UALR. In her written statement, Branch explained that she maintained a personal Facebook page separate from her university role and did not list UALR as her employer on that page.

30. Branch made the posts as a private citizen, outside the performance of her faculty and clinic duties. During the University's investigation, Branch stated that the posts were not made during work hours and were not made from a university computer, and the HR summary recorded those same facts.

31. Branch's posts were not classroom instruction, clinic advice, client communication, or official University communication. They were personal political commentary posted on her own account.

32. Branch later explained in writing that she regarded the posts as personal expression concerning a public figure and broader political and social issues. She further stated that her original posts had limited direct reach before Defendant's outside amplification dramatically expanded public attention to them. The analytics she submitted as part of her written statement reflected comparatively modest initial engagement on her own page and with absolutely no students' or professors' engagement.

33. Branch's original Facebook posts were made on a personal account with privacy settings that limited their initial visibility and reached her immediate network of friends and followers.

34. Branch later made the posts private after safety concerns arose due to the backlash from the Defendants' actions.

35. The minimal public stir is not directly attributable to Branch's private social media post itself and it was not caused by the original post on Branch's personal Facebook page, but by the subsequent republication and amplification of Branch's statements by political officials and media operatives who made their own inflammatory comments to incite an emotional reaction from readers about her posts and Defendants disseminated their comments about Branch's post widely beyond Branch's limited personal network. Branch's Facebook friend

list had a minimal number of students on her page, and she did not aim the posts at students, did not post when most students would be watching their teachers page, did not represent that the post was the post of a professor on behalf of the school. Branch had no intent to connect her private citizen public speech to UALR. It was the actions of others that caused the connection to UALR, and the majority of the students said that her personal opinions had no impact on their education.

36. Branch’s speech did not arise from an internal workplace grievance. It concerned a public figure, a nationally discussed event, and Branch's own political views about those matters.

37. At all relevant times, Branch's speech was separate from the institutional functions for which she had been hired: directing the Low-Income Taxpayer Clinic, supervising students, teaching clinic-related coursework, and carrying out grant- and client-related responsibilities.

**External Pressure and the University's Immediate Response**

38. Tim Griffin shared the posts on his Facebook page with the power and force of his position and to his extremely larger following to parties who, but for his actions, would not have been aware of the Facebook posts at all. The news would not even have become aware of the post, but for Tim Griffin reposting the comments.

39. At 10:10 AM: Dean Colin Crawford coordinates with legal counsel regarding the offer letter and the emerging political pressure.

40. At 11:09 AM: Dean Crawford receives a formal letter from Lt. Gov. Leslie Rutledge demanding an "immediate investigation".

41. At 1:00 PM: Chancellor Christina Drale announces Professor Branch is suspended with pay pending investigation.

42. By September 16, 2025, Branch's off-duty Facebook posts had become the subject of escalating outside pressure directed at UA Little Rock, including Bowen Law School. The

matter did not unfold as an ordinary internal employment issue. Instead, it quickly became a politically amplified controversy driven by public officials, outside complainants, and reputational concerns.

43. Attorney General Tim Griffin posted screenshots to his Facebook page, calling them "appalling." Further, he stated in a Facebook post, "We should and do have broad academic freedom in this country." In his position of power and prestige he exclaimed "… protections for scholarship offer no reason for an employer to tolerate an employee unabashedly celebrating political assassination."

44. On September 16, 2025, news articles titled, "Arkansas officials call for law professor's firing over Charlie Kirk comments" were published by KUAR and written By Josie Lenora.

45. On the same day, September 16, 2025, Attorney General Griffin decided to amplify the pressure by creating a press release on an official Arkansas webpage entitled "Attorney General Griffin Calls for Termination of UALR Law School Professor", https://arkansasag.gov/news-release/attorney-general-griffin-calls-for-termination-of-ualr-law-school-professor/ last seen March 19, 2026. The press release specifically stated: "The First Amendment protects your right to say what you want. It does not, however, guarantee you the job you want, regardless of what you say. The law school should terminate her immediately."

46. Lt. Gov. Leslie Rutledge called for an investigation into Branch's comments. "These statements are incompatible with the values of higher education, the legal profession, and the rule of law." The letter is addressed to Colin Crawford, the dean of Bowen School of Law. It's unclear as to what specific steps she wants the school to take other than "appropriate disciplinary action."

47. On September 16, 2025, a communications operative tied to Political Strategies / Conduit contacted Dean Colin Crawford asking whether the law school was aware of Branch's comments and what action would be taken. This contact reflected early external pressure directed at the school to respond publicly and institutionally to Branch's speech.

48. Also on September 16, 2025, the University of Arkansas System President's office circulated a message concerning Branch's posts to trustees and indicated that it could be shared with others asking about the matter. The issue was therefore elevated quickly beyond a routine personnel matter and into a system-level problem because of outside political influence.

49. External pressure came from Defendants political officials invoking campus safety, professionalism, institutional reputation, parent confidence, employer concerns, and public image.

50. On September 16, 2025, Attorney General Tim Griffin publicly called for Branch's termination. His official public statements and related press release became part of the documented antagonizing environment surrounding the treatment of Branch's speech. Lt. Gov. Leslie Rutledge likewise called for investigation and discipline.

51. Attorney General Griffin also issued an official press release entitled, "Attorney General Griffin Calls for Termination of UALR Law School Professor."

52. The press release specifically stated: "The First Amendment protects your right to say what you want. It does not, however, guarantee you the job you want, regardless of what you say. The law school should terminate her immediately."

53. Governor Sarah Huckabee Sanders also publicly posted that Branch should be "fired immediately."

54. Attorney General Tim Griffin posted screenshots to his Facebook page, calling them "appalling." Further, he stated in a Facebook post, "We should and do have broad academic freedom in this country." In his position of power and prestige he exclaimed "… protections for scholarship offer no reason for an employer to tolerate an employee unabashedly celebrating political assassination."

55. On September 16, 2025, news articles titled, "Arkansas officials call for law professor's firing over Charlie Kirk comments" were published by KUAR and written By Josie Lenora.

56. On the same day, September 16, 2025, Attorney General Griffin decided to amplify the pressure by creating a press release on an official Arkansas webpage entitled "Attorney General Griffin Calls for Termination of UALR Law School Professor", https://arkansasag.gov/news-release/attorney-general-griffin-calls-for-termination-of-ualr-law-school-professor/ last seen March 19, 2026. The press release specifically stated: "The First Amendment protects your right to say what you want. It does not, however, guarantee you the job you want, regardless of what you say. The law school should terminate her immediately."

57. Lt. Gov. Leslie Rutledge called for an investigation into Branch's comments. "These statements are incompatible with the values of higher education, the legal profession, and the rule of law." The letter is addressed to Colin Crawford, the dean of Bowen School of Law. She then demands "appropriate disciplinary action."

58. Governor Sarah Huckabee stated on X, a social media account, that Branch should be "fired immediately." Instead of correcting and advising Governor Huckabee and properly instructing her on the First Amendment, which is the duties of the Lieutenant Governor and the Attorney General they doxxed Felicia Branch publicly, and to UA and UALR staff applied ultimate pressure because of their ability to influence the removal of UALR and UA

employees from their positions and the perceived ability to pressure the stop of federal funds to UALR based on their federal influence and relationships, and ability to push policies and political movement in Arkansas and around the nation.




59. The controversy quickly became a broader political and media event based on Defendants' comments and political posturing about her private citizen statements. By September 17, 2025, the University was tracking the matter through large-scale media-monitoring reports and related public-reaction materials, reflecting that the institution was feeling the pressure of the politicians' commentary and demands for termination.

60. Also, on September 16, 2025, the University suspended Branch with pay while it investigated her posts. The University claimed that they would give her an opportunity to be heard and to present her position, but it was clear that UALR intended to remove her from the position as they were asking for her keys before she had even had the meeting.

61. The University's response was immediate and operational, not merely administrative. On September 16, 2025, clinic administration sought an immediate status report concerning tax

clinic matters and pending deadlines, showing that the suspension of Branch triggered an institutional response affecting the clinic's ongoing work. Branch was immediately locked out of her client's files, prevented Branch from representing her clients extremely technical and specialized areas, and prevented Branch from communicating to her clients that they would need to seek alternative representation or requests extensions of time for upcoming hearings.

62. At the same time, the University began handling the matter as a disciplinary issue. The FOIA record reflects that outside pressure, internal message circulation, and public officials' reactions were all entering the University's decision environment almost immediately after Branch's posts drew broader attention due to Defendants' actions.

63. As the external pressure intensified, the controversy surrounding Branch's speech was no longer confined to the actual content and reach of her original Facebook posts. It had become an externally amplified event shaped by public officials, media dissemination, and public officials' complaints and public directives for termination directed at UA Little Rock and its law school.

**Internal Hardening, Mixed Reaction, and Process Red Flags**

64. As outside pressure mounted, University leadership did not maintain a neutral investigative posture. Instead, the administration adopted a condemnatory tone early in the process, before the matter had been meaningfully closed.

65. By September 17, 2025, an internal Dean Statement Draft already described Branch's posts as "reprehensible" and as celebrating a political assassination, even though the investigation was still supposedly ongoing. That early internal characterization reflected a hardened administrative posture before the University's process had run its course.

66. On September 17, 2025, Branch met with Human Resources and explained the context of her posts. The HR summary recorded that Branch confirmed the posts were hers, stated they were not made during work hours or from a university computer, explained that she later made them private after safety concerns arose, and reported that none of her students had complained to her directly.

67. Even while politically pushed criticism was mounting, the response to Branch was not one-sided. The record included support for Branch, support for free expression, and internal disagreement with termination. At least one support message objected to punishing Branch for speech on a personal platform, and later materials reflected additional support from students, alumni, and others who viewed termination as an unconstitutional overreaction.

68. Branch also later stated that she received support from non-friends, a Bowen student, a clinic client, professors, and other students, and that some supporters feared retaliation if they spoke publicly. She also received support from attorneys. Those facts are inconsistent with any suggestion that the internal and surrounding reaction to her speech was uniform or overwhelmingly in favor of termination.

69. At the same time, the University was already taking steps that suggested the outcome of the process was narrowing before Branch was fully heard. The most significant red flags appear in the September 22-24, 2025, time frame.

70. On September 22, 2025, the school was already moving to hire Alicia Mitchell temporarily to teach and direct the Tax Clinic during Branch's suspension, and requests were made the same day to begin access and key arrangements for Mitchell. Those replacement steps were underway before the University formally completed its process as to Branch.

71. Also on September 22, 2025, after replacement for her job position planning was already underway, Crawford emailed Branch stating that the investigation had concluded, identifying the theories under review, and saying that he "reserve[d] judgment" pending a meeting with her on September 24. This juxtaposition—replacement activity on one hand and a stated reservation of judgment on the other—supports the inference that the process was decided and concluded before the opportunity for Branch to be heard was formally closed.

72. In that September 22 communication, Crawford told Branch that the investigation had concluded, and most importantly cited complaints from constitutional officers, other appointed officials, and legislators; invoked professionalism standards and Board Policy 405.4; and stated that her posts "may constitute cause for dismissal." He nevertheless represented that he would reserve judgment until after meeting with her.

73. The same process window also included legal coordination around a draft dismissal notice on September 24, 2025. The existence of draft-dismissal activity in that same period further supports the inference that the disciplinary outcome had crystallized before the process was meaningfully complete.

74. In her written statement dated September 24, 2025, Branch directly challenged the fairness and openness of the process. She argued that she was speaking as a private citizen on a personal Facebook page and that the matter was not a real investigation because the University's communications made it appear that the decision had already effectively been made. She also asserted that the amplification by constitutional officers—not the original reach of her posts—caused the disruption later invoked against her.

75. Branch further stated that the clinic disruption cited by the University was itself tied to her suspension and the institution's own response. She asserted that the clinic had been disrupted because she had been removed from it without proper notice and communication to the clients and because the clinic could not function normally without a qualified director in place.

76. Further, the comments from two students that were received by Plaintiff in FOIA requests from the University were initially sent to the Office of Governor Sarah Huckabee Sanders, which did not create disruption for students, who were unaware of the comments, at the campus. For example, on September 16, 2025, at 4:56 and stated, “Hi Governor, The law professor you just posted on Facebook”, which is a clear indication that her comment was incited by the political posts, and not the exercised freedom of speech on Branch’s personal Facebook post. It can be gleaned that but for the post of the Governor she would not have seen Branch’s post. Importantly, the comment directed to the Governor sought to support the Governor’s efforts and made no reference to her inability to learn or a disruption at the school. The student also exclaimed “We cannot let this evil infect the law school” indicating that the message had not impacted the law school or infected it. The message was based on what might happen and not what did happen and was completely in response to the Governor’s statements. The statement did not directly concern the University as it was more about a political move to join the team of the Governor to spread the Governor’s political message.

77. Furthermore, but for the Governor’s office forwarding the email to the University, Lt. Gov. Rutledge’s and Attorney General Griffin’s public statements and them seeking other messages to forward to the University and inciting the republican public to anger; the alleged disruption would not have occurred.

78. The mere disagreement and political motivation of a student based on what was posted by the Governor about what Plaintiff posted does not translate to the ability to violate Branch's Constitutional rights. The Freedom of Speech permits students to disagree with the private speech of a citizen for other purposes without consequence. The Freedom of Speech is not limited by one's personal opinion or political motivation to determine your words are incorrect and therefore should be suppressed but it is based on your right to think, believe, and speak those positions and ideas freely without fears of consequences.

79. The process did not end with Crawford's decision. After Branch pursued review, the Faculty Appeals panel later voted to disagree with termination, and the University's own final decision materials acknowledged that the panel majority believed a warning would have been more appropriate than dismissal.

80. Nevertheless, Chancellor Drale overrode that lesser recommendation and made the dismissal final. That sequence—early condemnatory posture, replacement planning before process closure, draft-dismissal activity, Branch's objections that the process was already decided, and ultimate override of the panel's non-termination recommendation—supports the inference that the University's response was not a neutral, open-ended review of protected speech, but a hardened disciplinary process moving toward the harshest sanction based on a biased predetermined opinion as directed by the Defendants.

**<u>Termination, Appeal, Panel Disagreement, and Final Override</u>**

81. On September 24, 2025, after meeting with Branch, Dean Colin Crawford issued a formal dismissal-for-cause letter terminating her employment effective immediately.

82. On September 30, 2025, Branch invoked the review procedure available under university policy and formally requested review of her dismissal.

83. The matter then proceeded through the University's internal review process. On October 9, 2025, the Faculty Appeals panel voted to disagree with termination. According to the later final decision, the panel majority viewed Branch's social-media posts as a mistake but concluded that a warning would have been more appropriate than dismissal.

84. The Faculty Appeals panel's disagreement was significant. It showed that, even within the University's own review structure, termination was not understood to be the only reasonable response to Branch's off-duty speech.

85. On October 13, 2025, Chancellor Christina S. Drale overrode the panel's non-termination position and upheld the dismissal. Her decision made Branch's termination final.

86. In her final decision, Drale rejected the argument that limited direct traffic on Branch's personal page, supportive feedback, or the role of high-profile third-party actors negated the disruption rationale invoked by the University.

87. Drale's final decision thus adopted the harshest available result despite the panel's contrary recommendation. Her override was the final institutional act that converted Crawford's dismissal decision into the University's completed termination of Branch's employment.

88. Further, based on the Dean's statements it can be inferred UALR intended to suppress Plaintiff's freedom of speech during the conversation when UALR suspended Plaintiff. Dean Crawford wrote, "The investigation also involved an interview where you confirmed that you wrote and posted the foregoing messages, ***in addition to messages you posted on subsequent***

***days - while on paid administrative leave pending investigation - challenging the Governor's and the Attorney General's criticisms of you and insisting on your position."*** This can only be read to mean that UALR intended to retaliate against Plaintiff by suspending her and intended to force her into silence or change her position.

89. Following the termination, the University treated Branch's separation as effective September 24, 2025, and later sent her separation and benefits information reflecting that effective date.

90. Defendants treated Plaintiff differently from other white and male employees. Non-black and male employees were not disciplined or terminated when they made public statements that were of equal distaste or that devalued a person or group in a public statement. Other employees did not undergo investigation of the statements or receive disciplinary action even when students complained of their commentary.

**SYNTHESIS OF THE FACTUAL ALLEGATIONS**

91. Taken together, the facts alleged above show that Branch's termination did not arise from a routine, neutral personnel process addressing an ordinary internal employment problem. Branch engaged in off-duty speech as a private citizen on her personal Facebook page about a matter of public concern, and the controversy that followed was rapidly escalated by outside political pressure, the defendants' actions, and resulting public amplification.

92. The Low-Income Taxpayer Clinic claimed that they had some operational concerns after Branch was suspended, which was the result of her disruptive and abrupt removal and not the cause of her actual post. Branch did not have Low-Income Taxpayer Clinic clients on her Facebook page. The facts also show that a substantial portion of the disruption later invoked against Branch was amplified by third parties and deepened by the University's own response,

including suspension, replacement planning, communications control, and the rapid treatment of the matter as a reputational crisis.

93. The record further reflects that the reaction to Branch's speech was not uniform. Alongside criticism, there was meaningful support for Branch, support for free expression, and internal disagreement with termination. The Faculty Appeals panel's later conclusion that a warning would have been more appropriate than dismissal is especially significant because it shows that even within the University's own review structure, the harshest sanction was not viewed as inevitable or necessary.

94. The chronology also supports the inference that the University's disciplinary posture hardened early and that the process narrowed toward termination before it was formally complete. The early condemnatory internal draft, the replacement planning that preceded the September 24 meeting, the draft-dismissal activity, and the final override of the panel's lesser recommendation all support the inference that Branch was not subjected to a genuinely open-ended review of protected speech, but to a process increasingly oriented toward justifying the harshest result.

95. Before the adverse action, Branch performed her duties, had not received complaints regarding her performance, maintained a strong professional reputation, and demonstrated the tax-law and clinic-management qualifications required for her position. But for Defendants' retaliation against her protected speech, she would not have been terminated.

96. In short, Branch was suspended and terminated for protected off-duty speech in an environment shaped by politically amplified backlash, institutional overreaction, and a progressively hardened disciplinary response. Crawford and Drale carried out and finalized that response, and Griffin's official public intervention materially intensified the pressure environment in which the adverse action occurred.

97. Branch has suffered emotional distress, mental anguish, and damage to her professional reputation.

98. As a result of her termination, Branch has suffered loss of wages, benefits, and other employment-related compensation.

## COUNT I — (42 U.S.C. § 1983 COMPLAINT) FIRST AMENDMENT RETALIATION / VIEWPOINT-BASED TERMINATION AGAINST DEFENDANTS UA TRUSTEES, COLIN CRAWFORD, AND CHRISTINA S. DRALE

99. Plaintiff incorporates by reference paragraphs 1 through 98 as though fully set forth herein.

100. At all relevant times, Branch engaged in activity protected by the First Amendment. Her Facebook posts were made from her personal account, outside the performance of her faculty and clinic duties, and did not constitute official University speech, classroom instruction, clinic advice, client communication, or any other speech made pursuant to her assigned professional responsibilities.

101. Branch spoke as a private citizen, not pursuant to her official duties, on matters of public concern, and Defendants subjected her to adverse action because of that speech.

102. Branch's speech addressed matters of public concern. Her posts concerned Charlie Kirk, a public figure, and broader public, political, and social issues arising from his death and public legacy. Even if defendants considered the speech offensive, harsh, or controversial, its character as public-concern speech did not disappear for that reason.

103. The controversial, offensive, or unpopular character of speech does not remove it from First Amendment protection or from public-concern status. Accordingly, even if Defendants regarded Branch's speech as harsh, offensive, or deeply misguided, that reaction did not eliminate its constitutional protection.

104. Defendants UA Little Rock, Crawford, and Drale acted under color of state law at all relevant times.

105. Defendants UA Little Rock, Crawford, and Drale subjected Branch to adverse employment action. Crawford suspended Branch, investigated her speech, and issued the dismissal-for-cause letter terminating her employment. Drale later upheld that dismissal and made it final notwithstanding the Faculty Appeals panel's disagreement with termination.

106. Branch's protected speech was a substantial or motivating factor in the adverse action taken against her. The disciplinary process, suspension, dismissal letter, and final affirmance were all expressly tied to the content, viewpoint, and consequences attributed to her Facebook posts.

107. Defendants disciplined Branch because of the content and viewpoint of her protected speech. The First Amendment forbids public officials from imposing adverse action because they disagree with the viewpoint expressed by the speaker.

108. Crawford personally knew the content of Branch's speech, investigated it, cited it as the basis for possible dismissal, invoked professionalism and disruption as reasons to sanction it, and made the decision to terminate her employment because of it.

109. Drale likewise personally knew the content of Branch's speech, the surrounding controversy, the arguments Branch raised in her defense, and the Faculty Appeals panel's recommendation short of termination. Despite that knowledge, Drale chose to adopt and finalize the harshest available sanction.

110. Branch has plausibly alleged a claim for First Amendment retaliation sufficient to overcome a motion to dismiss.

111. At the pleading stage, Branch need only plausibly allege that she spoke as a citizen on a matter of public concern and that her speech was a substantial or motivating factor in the

adverse action. She need not prove at this stage that her interest in speaking outweighs the government's interest in efficient operations.

112. The Pickering balancing test is fact-intensive and requires development of a full evidentiary record concerning actual disruption, workplace relationships, operational harm, and the employer's legitimate interests. It is not appropriately resolved on a motion to dismiss where, as here, the complaint plausibly alleges protected speech and retaliatory motive, and the defendants' asserted justifications rest on disputed factual predicates including the nature, source, and extent of disruption.

113. Defendants' stated rationale for dismissing Branch rested on disruption, professionalism, and institutional harm. But the facts alleged above support the inference that this rationale was legally and factually inadequate. The controversy surrounding Branch's speech was rapidly escalated by outsider complaints, political pressure, media amplification, and reputational concerns, and a substantial portion of the disruption later invoked against Branch was amplified by third parties and deepened by the University's own response.

114. Complaints, public condemnation, reputational discomfort, and politically amplified backlash do not by themselves establish constitutionally sufficient disruption to justify termination of protected off-duty speech by a public university faculty member. Nor does vague invocation of professionalism automatically outweigh First Amendment protection, particularly where professionalism is functioning as a proxy for suppressing disfavored viewpoint expression.

115. The facts alleged above further support the inference that defendants' actions were retaliatory and pretextual. University leadership adopted a condemnatory posture early; replacement planning began before the process was meaningfully closed; draft-dismissal activity occurred in the same window in which Crawford claimed to reserve judgment; and

Drale overrode the Faculty Appeals panel's conclusion that a warning, not termination, was the appropriate response.

116. By suspending and terminating Branch because of her protected off-duty speech and the viewpoint she expressed, Defendants UA Little Rock, Crawford, and Drale violated Branch's rights under the First Amendment to the United States Constitution.

117. By suspending and terminating Branch because of her protected off-duty speech and the viewpoint she expressed, Defendants Crawford and Drale violated Branch's rights under the First Amendment to the United States Constitution.

118. It was clearly established long before 2025 that government officials may not retaliate against a public employee for protected speech on matters of public concern. Defendants Crawford and Drale were therefore on notice that they could not suspend and terminate Branch for protected off-duty speech merely because that speech generated controversy, criticism, or reputational discomfort.

119. As a direct and proximate result of Defendants Crawford's and Drale's unconstitutional conduct, Branch has suffered and continues to suffer loss of employment, loss of income and benefits, emotional distress, other compensable damages, and ongoing constitutional injury.

120. Defendants Crawford and Drale are sued in their individual capacities for damages and in their official capacities for declaratory and prospective injunctive relief, including reinstatement or equivalent prospective relief. Defendant UA Little Rock is sued as Branch's employer for declaratory and prospective equitable relief to the extent permitted by law.

**COUNT II — (42 U.S.C. § 1983 COMPLAINT)**
**FIRST AMENDMENT VIEWPOINT DISCRIMINATION / RETALIATORY PRESSURE BY COORDINATED OFFICIAL AMPLIFICATION AGAINST DEFENDANT TIM GRIFFIN, IN HIS INDIVIDUAL CAPACITY**

121. Plaintiff incorporates by reference paragraphs 1 through 120 as though fully set forth herein.

122. The First Amendment forbids a government official from accomplishing indirectly what he cannot do directly. Government officials may not use threats, coercive pressure, or the leverage of official authority to induce others to punish or suppress disfavored speech.

123. At all relevant times, Branch was engaged in speech protected by the First Amendment. Her Facebook posts were made as a private citizen on her personal account, outside her official duties, and concerned matters of public concern.

124. At all relevant times, Defendant Tim Griffin was the Attorney General of the State of Arkansas and acted under color of state law. His public statements concerning Branch carried the authority, prestige, and amplification power of that office.

125. Griffin publicly targeted Branch's speech because of its content and viewpoint. On September 16, 2025, Griffin publicly called for Branch's termination and amplified attention to her posts through official channels, including an official press release demanding that the law school "terminate her immediately."

126. Branch does not challenge Griffin's ability, as a private matter, to hold opinions or to express disagreement with her speech. Rather, she challenges Griffin's use of the authority and amplification power of his office to push punitive action against protected speech. That is the conduct at issue in this Count.

127. Griffin was not Branch's employer and was not the final decisionmaker with respect to her suspension or dismissal. But he did not need to be the direct employer to contribute materially to the constitutional injury alleged here. Count II is based on Griffin's role as an outside state actor who used official authority to intensify and channel retaliatory pressure toward the University officials who did terminate Branch.

128. Griffin's conduct was not limited to generalized public disagreement. Viewed in context, his intervention was formalized through official channels, carried the prestige and coercive significance of statewide office, and became part of the University's decision environment at the very outset of the controversy.

129. The University's own disciplinary record reflects that complaints and pressure from constitutional officers and other high-level public actors were treated as institutionally relevant. Crawford's dismissal rationale expressly relied on complaints from statewide officials, among others, and Drale's final decision expressly addressed Branch's argument that high-profile outside actors had amplified the controversy and disruption narrative.

130. Griffin's official conduct materially intensified the retaliatory environment surrounding Branch's speech. Branch alleged and the record reflected that her original posts had limited direct reach on her own page before amplification by powerful outside actors dramatically expanded the controversy. The resulting public firestorm then became part of the pressure context in which the University suspended, processed, and terminated her.

131. Griffin's conduct therefore materially contributed to the chain of events leading to Branch's termination. Plaintiff does not allege that Griffin alone fired her or that he was the sole cause of the adverse action. Plaintiff alleges that Griffin's official pressure and amplification helped set in motion, intensify, and shape the retaliatory environment in which the University decisionmakers acted.

134. Griffin's intervention targeted Branch because of the viewpoint she expressed. His official demand for termination was directed not at some neutral rule violation divorced from speech, but at Branch's protected political expression itself and the public controversy that expression generated.

135. By using the authority and amplification power of his office to press punitive action against protected speech and to materially intensify the retaliatory environment that culminated in Branch's dismissal, Griffin violated Branch's rights under the First Amendment to the United States Constitution.

136. Griffin's challenged conduct consisted of extra-judicial public and official communications, not prosecutorial advocacy in court, and therefore is not shielded by absolute prosecutorial immunity.

137. As a direct and proximate result of Griffin's unconstitutional conduct, Branch has suffered and continues to suffer loss of employment-related interests, emotional distress, other compensable damages, and ongoing constitutional injury.

138. Griffin is sued in his individual capacity only. Branch seeks damages, nominal damages, punitive damages where legally available, costs and reasonable attorneys' fees under 42 U.S.C. §§ 1983 and 1988.

## RESPONSE TO ANTICIPATED DEFENSES

### Sovereign Immunity — Retrospective Declaratory Relief

139. Defendants have contended that Branch's request for declaratory relief is barred by sovereign immunity because it seeks only a declaration regarding the legality of completed past conduct.

140. That contention is without merit. Branch seeks prospective declaratory relief to establish that Defendants' suspension and termination policies, as applied to her protected speech, violate the First Amendment and to prevent future enforcement of those unconstitutional policies against her and similarly situated individuals.

141. The declaration Branch seeks is not a mere retrospective proclamation of past liability, but a forward-looking determination of the parties' legal rights and obligations necessary to

support prospective injunctive relief, including reinstatement and restoration of employment status.

142. Branch's request for declaratory relief defines the legal rights and obligations of the parties in anticipation of future conduct and ongoing consequences of Defendants' unconstitutional actions and therefore falls within the prospective relief permitted under federal law.

## SOVEREIGN IMMUNITY — MONETARY RELIEF AGAINST CRAWFORD AND DRALE

143. Defendants have contended that Branch's claims for monetary relief against Crawford and Drale in their individual capacities are barred by sovereign immunity because Branch in fact seeks damages from the State.

144. That contention is without merit. Branch seeks damages from Crawford and Drale personally in their individual capacities for violating her clearly established constitutional rights.

145. Individual-capacity claims are not claims against the State and do not implicate sovereign immunity. Officials sued in their individual capacities are personally liable for constitutional violations and must satisfy any judgment from their own funds or applicable indemnification, not directly from the state treasury as a matter of federal constitutional command.

146. The fact that the State or the University may choose to indemnify Crawford and Drale under state law does not convert Branch's individual-capacity claims into claims against the State for sovereign-immunity purposes.

147. Branch's complaint expressly distinguishes between official-capacity claims for prospective relief and individual-capacity claims for damages and seeks monetary relief only against defendants sued in their individual capacities.

**UALR DOES NOT ENJOY SOVEREIGN IMMUNITY**

148. UALR, as a part of the University of Arkansas system, does not enjoy sovereign immunity in this action.

149. UALR receives substantial non-state funding, including federal grants for the Low-Income Taxpayer Clinic program and other federally funded programs.

150. These federal funds are conditioned upon compliance with federal civil-rights laws, including laws prohibiting retaliation for protected speech.

151. UALR's acceptance of federal funding subject to federal civil-rights conditions constitutes a waiver of sovereign immunity for claims arising under those federal civil-rights statutes.

152. UALR is not an arm of the State for Eleventh Amendment purposes because it operates with substantial financial independence from state appropriations, receives significant non-state funding, and its relevant funding streams require compliance with federal law.

153. The activities of the Low-Income Taxpayer Clinic directed by Branch are proprietary in nature, involving client representation, service provision, and professional activity subject to federal grant conditions, rather than traditional governmental functions.

154. UALR's participation in the federal Low-Income Taxpayer Clinic grant program, which funded Branch's position and required compliance with federal civil-rights laws as a condition of funding, waived any sovereign immunity UALR might otherwise assert with respect to claims arising from Branch's termination from that federally funded position.

155. Because UALR's funding mechanism requires compliance with federal civil-rights laws and because the clinic's actions are proprietary rather than governmental, UALR may not invoke sovereign immunity to bar Branch's claims for prospective declaratory and injunctive relief.

156. Further, UALR voluntarily and unequivocally consented to waive its Eleventh Amendment immunity.

157. UA generally receives federal funding to operate the University and for disability programming from the Department of Education. According to USAspending.gov, the University of Arkansas received $79.5 million in federal funding from 453 federal transactions.

158. The UALR also participates in federal financial aid programs such as the Pell Grant, Direct Loans, Federal Work-Study, and Supplemental Educational Opportunity Grant University of Arkansas. Additionally, UA at Little Rock has received federal Preschool Development Grant funding from the Department of Health and Human Services.

159. Accordingly, UA and UALR have waived their Eleventh Amendment immunity.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Felicia Branch respectfully requests that the Court enter judgment in her favor and grant the following relief:

**A.** Declare that Defendants UA Little Rock, Colin Crawford, and Christina S. Drale violated Plaintiff's rights under the First Amendment by suspending and terminating her for protected off-duty speech;

**B.** Declare that Defendant Tim Griffin violated Plaintiff's rights under the First Amendment by using the authority and amplification power of his office to materially intensify the retaliatory environment that culminated in Plaintiff's termination;

**C.** Enter prospective injunctive relief against Defendant UA Little Rock and against Defendants Crawford and Drale in their official capacities, prohibiting continued enforcement of the unconstitutional actions challenged herein and requiring sufficient relief to remedy the ongoing consequences of those actions;

**D.** Order Plaintiff's reinstatement to her prior position as Assistant Professor of Clinical Education and Director of the Low-Income Taxpayer Clinic, or to an equivalent position with substantially similar responsibilities, status, seniority, and benefits;

**E.** Restore Plaintiff's seniority, employment status, and employment-related benefits to the extent permitted by law;

**F.** Award front pay in lieu of reinstatement only if the Court determines that reinstatement is not feasible;

**G.** Award back pay, lost employment benefits, and other economic damages to the extent permitted by law;

**H.** Award compensatory damages against Defendants Crawford, Drale, and Griffin, in their individual capacities, in an amount to be determined at trial;

**I.** Award nominal damages against Defendants Crawford, Drale, and Griffin, in their individual capacities;

**J.** Award punitive damages against Defendants Crawford, Drale, and Griffin, in their individual capacities, to the extent permitted by law;

**K.** Award Plaintiff her reasonable attorney's fees, costs, and expenses pursuant to 42 U.S.C. § 1988 and other applicable law;

**L.** Award pre-judgment and post-judgment interest as allowed by law; and

**M.** Grant such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Dated: September 9, 2026

Respectfully submitted,

The Swanigan Firm
425 W. Capitol Ave #1533
Little Rock, Arkansas 72201
(866) 603-5239 — Phone
(501) 604-5700 — Fax
callthelawlady@outlook.com

/s/Verona E. Swanigan
Verona E. Swanigan
State Bar No. 2017012

**/s/Pasquel Lee**
Pasquel Lee, Esq.

*Counselors for Plaintiff Felicia Branch*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 10, 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

Verona E. Swanigan
VERONA E. SWANIGAN